# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

DOUGLAS EDWARD DWORAK,
Defendant and Appellant.

S135272

Ventura County Superior Court
2004016721

July 15, 2021

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Cuéllar, Kruger, Groban, and Jenkins concurred.

PEOPLE v. DWORAK

S135272


Opinion of the Court by Liu, J.


Defendant Douglas Edward Dworak was sentenced to death in 2005 for the rape and murder of Crystal Hamilton. The jury found Dworak guilty of one count each of murder and rape (Pen. Code, §§ 187, subd. (a), 261, subd. (a)(2); all undesignated statutory references are to the Penal Code) and found true the special circumstance that the murder was committed while Dworak was engaged in the commission of rape (§ 190.2, subd. (a)(17)(C)). Dworak waived his right to jury trial on two prior felony conviction allegations and admitted to prior convictions for rape (§ 261, subd. (a)(2)) and sexual penetration with a foreign object while using a weapon (§ 289, subd. (a)(1)). This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS

### A. Guilt Phase

#### 1. Prosecution Case

The prosecutor's theory at trial was that Dworak, who had previously been convicted of rape and who admitted to a history of consensual sexual encounters with prostitutes during times of stress in his marriage, sought out nonconsensual sex the evening of April 20, 2001, after he and his wife had an argument, and while his wife was out of town. The prosecutor speculated that the victim, Crystal Hamilton, may have mistaken Dworak's white pickup truck for that of her father, who was on his way to

1

pick her up from a shopping plaza sometime around midnight. During the course of their encounter, the prosecutor argued, Dworak raped Hamilton and then murdered her in order to avoid a return to prison, leaving her body in the water at a deserted point of Mussel Shoals Beach in Ventura.

The prosecutor opened her case with testimony from Cynthia W. concerning Dworak's prior convictions. In October 1986, Cynthia was returning home from a shopping trip when Dworak approached her in her driveway. Dworak grabbed her from behind and put a large hunting knife to her throat. They struggled; Cynthia's glasses fell off and she sustained a cut on her thumb. Dworak took Cynthia to the back of her car, put his finger in her vagina, and raped her. He then told her to "stay put" or else he would come back and hurt her. After Dworak left, Cynthia ran inside her home and called her husband and then 911. She provided a statement to the police and identified Dworak as the perpetrator. Dworak was 20 years old at the time. He was convicted of rape and sexual penetration with a foreign object while using a weapon and was sentenced to 18 years in state prison.

Dworak was paroled to Ventura County in 1996. In 1999, he married Susannah Dworak. They fought frequently, and Dworak described Susannah as a "raging bitch" who "got on [his] case about everything," including his fishing trips with friends to Mussel Shoals, among other places. Dworak told detectives that he was "sexually frustrated" and sought to have sex with prostitutes in Ventura because there "just wasn't any sex happening."

Susannah worked for an oral surgery group. On the weekend of April 21, 2001, Susannah was scheduled to attend a

certification course in Irvine to become an oral surgery assistant. The day before the training, Susannah called the office to explain she would not come in that day. Susannah was crying and upset but confirmed she would attend the weekend training. Susannah attended the conference; a coworker who shared a room with Susannah described her as "very upset, very emotional" that weekend because she had "a rough day Friday."

Dworak was employed at a general contracting company. He was "on-call" the weekend of April 21 but did not work either day. A neighbor testified that Dworak stopped by to talk that weekend; Dworak told the neighbor that his wife was away and that he was "out living it up and playing pool and — at the local bars and going down to Ventura and staying out late." The neighbor testified that Dworak seemed to be in good spirits and told her, " '[W]hen the cat's away, the mouse will play.' "

Crystal Hamilton was 18 years old in April 2001. She lived in Oxnard with her father, Air Force Lieutenant Colonel Michael Hamilton and two siblings. She frequently wore small jewelry items; Hamilton's sister recalled that she was wearing a bracelet when she left home the day before her death to attend a small gathering at the home of Matt Zeober, a friend and former classmate. Zeober lived with his mother, Robyn Jones, in Ventura. During that gathering, which took place on Friday, April 20, Zeober, Hamilton, and some friends smoked marijuana and used methamphetamines. Hamilton spent the night at Zeober's home.

Hamilton remained at Zeober's house the next day. In the afternoon, Hamilton called her father asking for a ride home. Lieutenant Colonel Hamilton was in Corona and told Crystal he could pick her up that evening. Hamilton made other calls

seeking a ride home but ultimately made plans to meet her father in the parking lot at a nearby Ralphs grocery store around midnight. That evening, Zeober fell asleep but then woke up between 8:00 p.m. and 10:00 p.m. Hamilton was drawing a picture and told Zeober she would be leaving soon, and he fell back asleep. It was the last time he saw Hamilton. When Zeober next woke up, the evening news was on and Hamilton was gone.

Lieutenant Colonel Hamilton arrived at the grocery store around midnight, driving a white pickup truck with no toolbox, but Hamilton was not there. He drove around looking for her in the parking lot, then drove to Zeober's home. The lights were off, and he did not knock on the door. Hamilton occasionally failed to appear when she made arrangements to meet her father, so he was not overly concerned at that point and did not call the police.

Jorge Valdez was fishing at Mussel Shoals Beach around dawn on Sunday, April 22, when he saw what looked like a body. The beach was approximately an 18-minute drive from the Ralphs store where Hamilton had planned to meet her father. Valdez went to a nearby fire station to report what he saw. Firefighters found Hamilton's body lying naked in the surf.

The firefighters recovered Hamilton's body and observed signs of lividity and rigor mortis, a cut over her left eye, and bruising around her hips. There was no clothing or jewelry on the body. Police searched the area but found no clothing, jewelry, or other evidence connected to Hamilton.

The autopsy revealed numerous injuries on Hamilton's body, including blunt-force trauma to the head; abrasions on her left breast, right shoulder, ribs, and hips; bruising on her left

upper bicep; abrasions and bruising to her left wrist and hand; and abrasions on her neck. Examination of the body and biopsies of some of the injuries confirmed that some of Hamilton's injuries, including the injuries to her right forehead area, breast, bicep, knee, and wrist, occurred before death. The medical examiner, Dr. Ronald O'Halloran, testified that marks on her left wrist could have been a pressure mark caused when an object like a bracelet was pressed into her skin before or after death. Dr. O'Halloran further testified that the injury just above the bridge of her nose was caused by an impact against a hard, blunt object that hit Hamilton in the head, such as a car or rock, but because no biopsy was performed of this injury, he could not testify as to whether it occurred before or after death.

Dr. O'Halloran described abrasions on a "relatively protected" area of Hamilton's neck that is not usually injured when a person falls down, explaining that "in manual strangulations, fingernails often leave" such marks. Hamilton had petechial hemorrhages in her eyes, which Dr. O'Halloran described as "a very common finding in manual strangulations." He acknowledged these can also occur as a result of CPR or violent vomiting but added there was no evidence that either had occurred here. There was sand and water in Hamilton's lungs. The toxicology report was positive for methamphetamine, amphetamine, and marijuana in amounts sufficient to affect Hamilton's "brain function, that is, she probably got high on it," but "not a level that generally is accepted to cause death."

Dr. O'Halloran determined that the cause of death was a homicide, and he opined that she likely died from drowning, though the evidence strongly indicated she was also manually strangled, perhaps while in the water. Based on the paramedics'

observations of lividity, rigor mortis, and body temperature, as well as contemporaneous measurements of the air and water temperatures in the area, Dr. O'Halloran estimated that Hamilton died between midnight and 3:30 a.m.

Dr. O'Halloran did not observe any injuries in the vaginal area. Seminal fluid, sand, and seaweed were present inside Hamilton's vagina. A forensic scientist at the Ventura County Sheriff's Department who later examined the vaginal swabs described the amount of sperm as "off the charts," indicating that it was deposited within one hour and 15 minutes of her death or much less, assuming she was ambulatory after intercourse. If she was not ambulatory (i.e., had laid down before intercourse and never got back up), the sperm could have been deposited 11 to 12 hours before her death. He acknowledged that this was the first examination he had conducted on sperm found in someone floating in cold water and that colder temperatures could have slowed degradation and prolonged sperm life. He also acknowledged that he did not prepare his sample using the same method as the studies he relied on.

An analysis of the vaginal swabs confirmed the presence of both sperm and nonsperm cellular material. A DNA profile from the sperm portion was submitted to the California Department of Justice's convicted offender DNA data bank . In March 2002, the Department of Justice notified the Ventura County Sheriff that the DNA profile from the sperm portion of the vaginal swabs matched the DNA profile on file for Dworak. The detective assigned to the case determined that Dworak was a sex offender and asked to be notified when Dworak next reported for mandatory registration.

When Dworak reported on May 12, 2003, he agreed to speak with detectives.  (The record does not explain the lapse of time between the DNA hit and this encounter.)  When asked, Dworak stated that he had been with three different prostitutes whom he picked up in Ventura over "a year and a half or so, maybe two" years earlier.  He explained that these encounters occurred during the afternoon when he got off work and that he used a condom each time.  He described one of the prostitutes as African American, one as "Mexican," and one as White.  He described the White prostitute as approximately 5 feet 4 inches tall, no tattoos, wearing make-up, and having wavy, shoulder-length hair that was "dirty brown, dirty blonde" in color.  She was "[m]iddle aged, . . .  maybe 20's, hard 20's" and looked "kind of hard — rode hard."  He denied recognizing either a photograph of Hamilton or her name.  The interview was tape-recorded and played for the jury.

Detectives interviewed Dworak again on June 11; a videotape of this interview was played for the jury.  This time, Dworak described the White prostitute as "mid-twenty something" with short "bleach blonde" hair.  Again, he described her as looking "kind of ragged, kind of rough," but this time he said she was not wearing makeup.  Dworak was again shown a picture of Hamilton, and he again denied recognizing her.

On July 22, detectives executed a search warrant on Dworak's home and place of business.  During the search, Dworak spoke with detectives; an audiotape of this interview was played for the jury.  Again, he was shown a photograph of Hamilton and said he did not recognize her.  Dworak was told that physical evidence implicated him in a sexual assault, to which he responded, "I don't mess with little kids," and again stated he did not recognize Hamilton.  He reiterated that outside

7

of his marriage he had only been with the three prostitutes he had already described and that he did not think Hamilton could be one of them. Dworak was arrested at the conclusion of the interview.

At the time of Hamilton's death, Dworak drove a white pickup truck similar in style to that driven by Hamilton's father. Following his arrest in 2003, Dworak's truck was searched. A stain on the driver's seat reacted to a screening test, indicating it may have been human blood, but the sample was too small to confirm. No DNA was found in the stain.

The jury was taken to view four locations relevant to the prosecutor's case: the outside of Zeober's home; the location of the Ralphs store; the south end of Mussel Shoals Beach, where Hamilton's body was found; and the north end of the beach, where a patrol officer from the Ventura Port District opined that Hamilton might have drowned based on the tides and currents at the time of her death. Dworak was known to fish and picnic at Mussel Shoals Beach, and he once told a friend of his that "if they went there early enough, nobody else would be there."

### 2. Defense Case

Scott Osler, one of Dworak's best friends, was with Dworak from 11:00 a.m. to 3:00 p.m. on April 21, shooting pool at the Hilltop Bar in Oak View. He testified that Dworak picked him up that day in his white pickup truck, which had a toolbox in the bed (in contrast to a similar truck driven at the time by Hamilton's father).

Dr. Robert Bux was an associate coroner and medical examiner for EI Paso County, Colorado. Before testifying, Dr. Bux reviewed the autopsy photographs, the death investigation report, autopsy report, and Dr. O'Halloran's trial testimony. Dr.

Bux testified that he could not form an opinion to a medical certainty that Hamilton's death was a homicide instead of an accident. In his opinion, Hamilton was not manually strangled because she lacked "congestion" above the level of strangulation, bruising around her neck, fractures to her thyroid cartilage, or petechiae on her lungs. In his opinion, the fact that the abrasions on her neck were horizontal rather than vertical was inconsistent with manual strangulation. He also could not form an opinion to a medical or scientific certainty that Hamilton had been raped, in the absence of injury to the vaginal region or inner thighs. Based on the toxicology report, Dr. Bux opined that Hamilton would not have been a "passive individual" during a sexual assault and would have defended herself. Finally, he opined that her postmortem injuries were consistent with being dragged on the ocean floor and against the rocks, and that her premortem injuries could have occurred during the act of drowning. He agreed that the evidence showed that Dworak's sperm had been deposited "recently" before death but said he was not aware of anything that could determine whether it had been deposited within minutes or a few hours.

## B. Penalty Phase

The prosecution's case in aggravation primarily relied on evidence from the guilt phase trial concerning the circumstances of the charged crime and Dworak's prior felony conviction for rape and sexual penetration with a foreign object (and related criminal activity involving force or violence). The following additional evidence was presented at the penalty phase:

Hamilton's father and grandfather testified about how Hamilton's death affected them and their families, including descriptions of her unique qualities as a person such as her

artistic and musical abilities. The court also permitted the introduction of one photograph of Hamilton playing the piano and two pieces of her artwork. Recalling his last phone call with Hamilton (about picking her up at the grocery store parking lot around midnight), her father blamed himself in part for what happened and said he felt he had let her down.

Rather than recalling Cynthia W. to the stand, the prosecutor called Allen Brambrink, a Napa County Sheriff's Department employee, to testify about the impact of the crime on Cynthia W. Brambrink testified that he knew Cynthia W. as a fellow county employee. When he saw her on the day of the crime, her hand was covered with a large bandage. He put his arm around her and could feel her tremble as she hugged him. He explained that there was "[s]omething about her demeanor," adding, "She needed something, and I — I just responded to my instincts."

Dworak called nine witnesses at the penalty phase: eight members of his family and a corrections expert. His niece testified to their close relationship; Dworak never acted inappropriately with her, and she did not believe he raped Cynthia W. or raped and killed Hamilton. Dworak's older brother and his sister-in-law described him as a good and helpful person; Dworak's older sister and his brother-in-law offered similar testimony. His sister testified that she did not believe Dworak raped Cynthia W. and acknowledged that she sent a card to Cynthia W. on the anniversary of the crime that read in part, "Happy Anniversary and many, many more. Just a little something for you to remember your RAPE. May you get AIDS, bitch. Having your son lie to cover up your blindness of being able to see your true rapist!" (Double underscoring omitted).

Dworak's mother described him as "a loving, outgoing young man." She did not want to see him executed because he had "too much to offer." His mother-in-law described him as helpful. She had never seen him act inappropriately with anyone. She was not aware before the trial that he had been convicted of rape.

Dworak's wife, Susannah, testified that she loved him deeply and that he was very close with his family. Dworak had told Susannah that he was wrongly convicted of raping Cynthia W. She acknowledged that they would argue about money and went through marriage counseling at the end of 2001. She said their marriage was getting better and they were thinking of starting a family before his arrest.

James Esten, an expert on the California prison system, opined that Dworak would be an "above average" inmate with useful skills as a teacher's aide based on his prior incarceration record. He acknowledged that Dworak obtained early release on his prior conviction for good behavior and would not have the same incentives while serving a sentence of life without the possibility of parole.

## II. GUILT PHASE ISSUES

### A. Exclusion of Defense Evidence

Before trial, and over the opposition of defense counsel, the prosecution moved to exclude defense evidence relating to third party culpability and victim character. Dworak contends the trial court erred in granting these motions. We hold that the trial court did not abuse its discretion in excluding this evidence.

### 1. Third Party Culpability

#### (a) Facts

The day after Hamilton's body was found, police searched Robyn Jones's home, the last place Hamilton was seen before her murder, with Jones's consent. Among other items, detectives found a bucket in the carport that contained a pair of wet, sandy jeans. Jones told the detectives she did not know where they had come from. One year later, Jones told detectives that she remembered two of her friends, Jay Campbell and Cindy Kinnaird, had gone to the beach on a date " 'the night Crystal was killed.' " Jones assumed they had come to her house to change clothes, an assumption confirmed by both Campbell and Kinnaird in separate statements to detectives. DNA evidence obtained from the jeans was later matched to a sample provided by Campbell. The prosecutor moved to exclude any testimony or evidence regarding the jeans, arguing "there was never anything connecting" the jeans to the crime.

Around the same time Jones told officers about Campbell and Kinnaird, she also told friends and detectives that her friend Danny Carroll may have been involved in Hamilton's rape and murder. Moving to exclude any evidence regarding Carroll, the prosecutor described him as "a long time drug user, low-level dealer, and occasional boyfriend" of Jones, adding that Dworak's "[m]arginal evidence" linking Carroll to the crime was insufficient to satisfy the admissibility standard set in *People v. Hall* (1986) 41 Cal.3d 826 (*Hall*).

Opposing the prosecutor's motion to exclude this evidence, Dworak pointed to statements from Jones that Carroll shaved his mustache and pubic hair shortly after the time of the crime; statements from Zeober that Carroll had stolen Jones's car on

the night that Hamilton was last seen and that it had a broken window and was full of sand when recovered; and statements from Zeober that Carroll commented on his desire to have a relationship with Hamilton. Zeober later admitted he did not actually hear this latter comment but was only speculating as to what "could have happened." Dworak also pointed to evidence that a computerized voice stress analysis conducted by detectives indicated that Carroll was deceptive, though the prosecutor countered that the test was administered poorly. Dworak also sought to introduce letters from Carroll to Jones offering his own speculations and musings as to what might have happened to Hamilton. As the trial court observed, these letters did not contain any suggestion that Carroll was involved in the crime. Collectively, Dworak argued, these facts "support an inference that Danny Carroll was involved, in some way, with the death of Crystal Hamilton."

The court granted both of the prosecutor's motions. As to Campbell's jeans, the court found no evidence connecting either the jeans or Campbell himself to Hamilton. Regarding Carroll, the court found there was no evidence "that actually puts [Carroll] in proximity" to Hamilton or linking any of the proffered evidence to the crime here. The court described the evidence proffered by Dworak as "weak[]" and found it would "not meet[] the threshold requirement that would reasonably create a doubt" as to Dworak's guilt.

### (b) Discussion

We review the trial court's decision to admit or exclude evidence for abuse of discretion. (*People v. Vieira* (2005) 35 Cal.4th 264, 292.) We have rejected any special rule governing evidence of third party culpability, explaining that "courts

should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code, ]§ 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([*id.*, ]§ 352)." (*Hall, supra*, 41 Cal.3d at p. 834.) In making this assessment, courts should be mindful that third party evidence "need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt." (*Hall*, at p. 833.) *Hall* explained that, in general, "evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*Ibid.*; see *People v. Prince* (2007) 40 Cal.4th 1179, 1242.)

We see no abuse of discretion in the trial court's decision to exclude evidence or testimony relating to Carroll or to the jeans linked to Campbell found in Jones's carport. As the trial court explained, there was no evidence placing Carroll in proximity to Hamilton at the time of her death, and any link between the jeans found in Jones's garage and Hamilton's death rested on speculation. Although the jeans could be seen as circumstantial evidence that Campbell was involved in Hamilton's death, such an inference requires speculation that the sand and water on the jeans were from the beach on which Hamilton's body was found, combined with additional speculation that this was the result of Campbell's presence at Hamilton's murder and not, as Campbell stated, a separate visit to the beach that same weekend. The trial court reasonably concluded that the probative value of this evidence related to

Carroll and Campbell, which produced only speculative inferences, was substantially outweighed by the risk that it would cause undue delay, prejudice, or confusion.

For the same reasons, we reject Dworak's further contentions that the trial court's exclusion of the evidence deprived him of his rights to present a defense, to compulsory process, and to confrontation, and thereby also violated his right to a reliable penalty determination under the Eighth Amendment to the federal Constitution. (*People v. Prince*, *supra*, 40 Cal.4th at p. 1243.)

### 2. *Victim Character Evidence*

Rachel Daniels had been one of Hamilton's closest friends. According to the prosecutor's motion in limine, Daniels was "a regular drug-user, and frequently had relationships with men to exchange for dope and/or money." Through Daniels, Hamilton met John Figueroa. A few months before Hamilton's death, Figueroa rented a motel room where Daniels, Hamilton, Zeober, and others "smoked drugs and partied." Hamilton called Figueroa the night of her death while looking for a ride home, but no witness placed Hamilton with Daniels or Figueroa on the weekend of her death. In a statement to police given two months after Hamilton's death, while in custody for being under the influence, Daniels stated that Hamilton was not engaged in prostitution but had been sexually active.

The prosecutor successfully moved to exclude any evidence regarding Hamilton's use of drugs and activities in the week before her death, including any evidence relating to Daniels and Figueroa. Dworak argued the evidence was relevant to explain "to the jury the possible actions taken by . . . Hamilton at the time this occurred," actions "other than just going to Ralphs

15

supermarket and waiting there for her father." Specifically, Dworak suggests, Hamilton may have contacted another person, who "offered to give her a ride, or perhaps such things as going to a party at a hotel room became more — another possibility of an action for her to take."

We find no abuse of discretion. The trial court reasonably found such evidence to be irrelevant, as it rested solely on speculation as to what might have occurred after Hamilton left Jones's home. (See *People v. Morrison* (2004) 34 Cal.4th 698, 711.) Nor was Dworak precluded from presenting evidence that Hamilton may have gone somewhere other than Ralphs that evening, as the court permitted him to cross-examine Zeober about whether Hamilton was attempting to call older men whom she "associated with" for a ride home that night.

### B. Exclusion of Victim Photograph

Dworak next claims the trial court prejudicially erred by admitting three photographs of Hamilton proffered by the prosecutor while excluding a booking photograph of Hamilton proffered by Dworak. Hamilton argues that the booking photograph would have provided a more accurate view of Hamilton at the time of her death and would therefore explain why he did not recognize her from the photographs shown to him by detectives. We find no error.

The prosecutor moved to admit three photographs of Hamilton while she was alive. The first photograph, taken weeks or months before Hamilton's death, was shown to Dworak during his first interview with detectives on May 12, 2003, and again during his third interview on July 22, 2003. The second photograph, taken several months earlier, was shown to Dworak during his second interview on July 11, 2003. Each time

detectives asked if he recognized the woman in the photograph, and each time he denied recognizing Hamilton. Over Dworak's objection, the trial court found these two photographs were "clearly admissible since they were photographs shown [to Dworak] during the course of this investigation, and he denied knowing the person depicted in those photographs."

The third photograph was taken approximately two years before Hamilton's death. It depicted Hamilton holding a cat while standing in front of a fireplace with family photographs behind her. In the picture, Hamilton was wearing the type of jewelry she normally wore, including a bracelet the prosecutor argued would have created the type of bruising observed on her wrist during the autopsy. Again over Dworak's objection, the trial court found the photograph to be admissible but ordered that it be cropped and blurred to depict only the articles of jewelry and not the cat or family photographs.

Dworak does not renew his objection to the three admitted photographs. Instead, he limits his argument to the trial court's purported error in denying his own motion to admit a booking photograph of Hamilton taken at the time of one of her juvenile arrests. According to defense counsel, the prosecutor's photographs would "presumably reflect what . . . [Hamilton] looked like when she was not using drugs" and so were irrelevant to show what she would have looked like "when she was using drugs and 'on the street.'" By contrast, defense counsel argued, the booking photograph would "more accurately reflect[] how she appeared when she was using drugs and how she may have appeared to [Dworak] when he came into contact with her."

The court denied Dworak's motion to admit Hamilton's booking photograph, explaining there was no showing that Hamilton was under the influence of drugs in the photograph, which was the sole basis proffered by Dworak to admit the photograph. "[W]ithout that additional link," the court explained, the photograph would not be admitted.

As presented by Dworak in his motion to admit the photograph, the relevance and thus admissibility of the booking photograph depends on the existence of the foundational fact that it more accurately depicted Hamilton on the night at issue because it showed her under the influence of narcotics. "The determination regarding the sufficiency of the foundational evidence is a matter left to the court's discretion." (*People v. Brooks* (2017) 3 Cal.5th 1, 47, citing *People v. Lucas* (1995) 12 Cal.4th 415, 466.) The trial court reasonably concluded that Dworak had not laid a sufficient foundation for this evidence, and we find no abuse of discretion in its decision to exclude the evidence.

## C. Exclusion of Newspaper Articles

During Dworak's first interview with the detectives in this matter, Detective Debbie Rubright told Dworak that they were investigating a crime that occurred two years ago involving a vehicle that matched a description of his car. She emphasized it was "still an ongoing investigation" so they would "only release a little bit of information as possible" during the interview. One of the detectives then showed Dworak a picture of Hamilton and asked whether he recognized her or had seen her in April 2001. Dworak asked, "How old is she?" Detective Melissa Smith replied, "I think she's 19. She would have been." Dworak then stated, "She would have been." Shortly thereafter,

Detective Rubright stated that they were going to continue investigating the crime, to which Dworak replied, "Well, yes it is if you have a deceased victim. Yeah, it something you guys are gonna [*sic*] continue as long as it takes." The transcript of the interview does not include any prior statement by the detectives that they were investigating a homicide. The prosecutor relied on this statement in her closing argument, referring to it as a "one of the absolutely best pieces of evidence in this case" and "an admission" of guilt because the detectives had not yet told Dworak that the victim was dead.

After the close of evidence from both parties, Dworak moved to introduce into evidence three newspaper articles from April 2001 concerning Hamilton's death. Dworak argued the articles were relevant to explain his statement to the detectives that the victim was deceased because it was a "matter of common knowledge throughout the county of Ventura" that Hamilton had died, and that the coroner had concluded her death was a homicide. The trial court denied the motion, agreeing with the prosecutor that Dworak had not laid a proper foundation for the evidence.

We agree with the trial court that Dworak made no offer of proof that he had read the articles before he was interviewed by the detectives. Without this foundation, the trial court did not abuse its discretion in excluding evidence that had not been shown to have any probative value. (Evid. Code, §§ 403, 352; cf. *People v. Curl* (2009) 46 Cal.4th 339, 360 [affirming exclusion of newspaper articles offered to show that a witness contrived his testimony based on news reports when there was no evidence the witness had seen the articles].) As we have previously explained, application of the ordinary rules of evidence — here, the requirement to lay a proper foundation — does not

"impermissibly infringe on defendant's right to present a defense." (*People v. Morrison, supra*, 34 Cal.4th at p. 725, citing *People v. Ramos* (1997) 15 Cal.4th 1133, 1178.)

## D. Evidence of Other Crimes

As noted, the trial court admitted evidence of Dworak's prior convictions for sexual offenses under Evidence Code section 1108, a ruling we review for abuse of discretion. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 824.) Dworak challenged the admissibility of this evidence below, and he renews those arguments on appeal. He also contends for the first time on appeal that the jury was improperly instructed on the relevance of this evidence. We reject these claims.

### 1. Admissibility

As a general rule, "propensity evidence is not admissible to prove a defendant's conduct on a specific occasion." (*People v. Jackson* (2016) 1 Cal.5th 269, 299; see Evid. Code, § 1101, subd. (a).) But Evidence Code section 1108, subdivision (a) provides an exception to this rule: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." Evidence Code section 352, in turn, provides that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "In short, if evidence satisfies section 1108, and is not excluded under section 352, admission of that evidence to prove propensity is permitted." (*People v. Molano*

(2019) 7 Cal.5th 620, 664, citing *People v. Daveggio and Michaud, supra*, 4 Cal.5th at p. 823.) As a reviewing court, we accord deference to a trial court's determination that the probative value of a particular piece of evidence outweighs any danger of prejudice. (See *People v. Miles* (2020) 9 Cal.5th 513, 587, 587–588 [" '[T]he court has broad discretion under Evidence Code section 352' " and reviewing courts " ' "will not disturb a trial court's exercise of discretion under Evidence Code section 352 ' "*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice" ' " ' "].)

Dworak was accused of the sexual offense of rape and with the special circumstance of murder in the commission of rape. Under Evidence Code section 1108, evidence of his prior sexual offenses was not inadmissible under Evidence Code section 1101 to show Dworak's propensity to commit the sexual offense of which he was charged and upon which the murder charge and the special circumstance allegations were based, so long as the evidence was not inadmissible under Evidence Code section 352. We have previously rejected the argument raised here by Dworak that admission of prior crimes under Evidence Code section 1108 violates the constitutional right to due process and a fair trial. (See, e.g., *People v. Rhoades* (2019) 8 Cal.5th 393, 415.)

"By reason of [Evidence Code] section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se," but trial courts "must engage in a careful weighing process under [Evidence Code] section 352." (*People v. Falsetta* (1999) 21 Cal.4th 903, 916, 917 (*Falsetta*).) It is this discretion to exclude propensity evidence under Evidence Code section 352 that "saves section 1108 from defendant's due process

challenge." (*Falsetta*, at p. 917.) The admissibility of such evidence " 'is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.' " (*Id.* at pp. 917–918.) We have instructed that the trial court's determination should be guided by such factors as the "nature, relevance, and possible remoteness" of the evidence, "the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Id.* at p. 917.)

As Dworak acknowledges, the prior offenses at issue were proven beyond a reasonable doubt in a criminal trial, and the trial court's inquiry appropriately emphasized that the degree of certainty that Dworak committed the prior crime was high, given that he was convicted of that crime. Nor is there any serious contention that the evidence was not probative on the question of whether he committed a sexual offense in this instance. The trial court accordingly concluded that the evidence was not likely to "mislead or in any way confuse this jury in terms of what it's being admitted for." In fact, the trial court declined to admit evidence of a different prior sexual offense — an alleged attempted rape — due to lack of certainty that Dworak committed that crime, noting that such evidence would distract jurors from the main inquiry by turning the trial into a mini-trial on the alleged prior offense.

Instead, Dworak contends the trial court erred in its assessment of other factors set forth in *Falsetta*, including the remoteness of the crimes, the degree of similarity, the prejudicial impact of the evidence on the jurors, and potential for confusing or misleading the jury, and thereby abused its discretion in allowing the evidence.

In assessing the remoteness of the crimes, the trial court said Dworak "spent nine years in prison following his conviction for that rape offense and had been released on parole for just a matter of   is it three or four years in this particular case before the offense occurred?" to which the district attorney confirmed "not quite four."  Dworak argues the trial court overlooked the two years he had been off probation before the charged offense was committed.  It is possible that the trial court misunderstood the timeline and failed to note that some time had passed during which Dworak was neither incarcerated nor on probation.  It is also possible that this level of nuance was lost in the court's explanation of its tentative ruling.  In either case, we find no error on the basis of the court's remoteness inquiry.  In *People v. Harris* (1998) 60 Cal.App.4th 727, the court found a gap of 23 years to be "a long time" and therefore to weigh in favor of exclusion.  (*Id.* at p. 739.)  But *Harris* observed that the " 'staleness' of an offense is generally relevant if and only if the defendant has led a blameless life in the interim."  (*Ibid.*)  Dworak was incarcerated or on parole for the prior offenses for the bulk of the time between the two incidents.  (See *People v. Loy* (2011) 52 Cal.4th 46, 62 [crimes committed 15 and 21 years before the charged offense were not so remote as to require exclusion where defendant had been in prison for much of the intervening time]; *People v. Pierce* (2002) 104 Cal.App.4th 893, 900 [finding no error in admitting a 23-year-old rape conviction

where the defendant had been incarcerated for 12 of those years].)

Dworak contends that the two incidents were similar only if the jury were to agree with the prosecutor that Hamilton was raped. In addition, he notes a number of factual differences between the two acts: Cynthia W. was older than Dworak, and the incident took place outside her home and involved the use of a knife. By contrast, Hamilton was younger than Dworak, and there is no specific evidence as to where the crime took place or whether a knife or other weapon was used. The proper focus of the trial court's inquiry is on the type of sex offense at issue (here, forcible rape), and differences in the manner in which the acts were committed or in the characteristics of the victims, while potentially relevant, are not dispositive. (See *People v. Loy*, *supra*, 52 Cal.4th at p. 63 [" '[T]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108.' "]; *People v. Earle* (2009) 172 Cal.App.4th 372, 397 [propensity evidence must tend to show "that the defendant is predisposed to engage in conduct of the type charged" (italics omitted)].) The points raised by Dworak are relevant to the trial court's exercise of discretion, but they are not enough to show that the trial court abused its discretion.

As to the potential for undue prejudice and the likelihood of confusion, the trial court observed that "the evidence of the rape of Cynthia W. is certainly less inflammatory than the evidence that's to be received in this case concerning the alleged rape and murder of Crystal Hamilton." Dworak contends that Cynthia W.'s testimony was itself prejudicial — more so than

the fact of the convictions — as it required the jury to "hear Cynthia W. relive her assault when she thought it was all over and done with and had put it in the back of her mind." But the trial court considered this argument and took care to limit the scope of her testimony. Dworak makes the related contention that the trial court erred by failing to consider the availability of less prejudicial alternatives. Defense counsel asked the court to use the fact of the prior convictions and prison sentence to prove the offenses rather than allow Cynthia W. to testify. But the trial court addressed this consideration by excluding medical evidence about the extent of Cynthia W.'s injuries and by carefully managing the extent of the prosecution's questioning. The potential for undue prejudice was also likely diminished by the trial court's provision of CALJIC No. 2.50.01 to the jury both directly before and directly after the former victim's testimony. (See *post*, at pp. 26–28.)

Finally, Dworak argues the jury may have been confused or distracted by a motivation to further punish him for his crimes against Cynthia W. because the jury knew he had served only nine years of his 18-year sentence for those crimes, a point emphasized by the prosecutor during her closing argument. Dworak did not raise this concern in the trial court; in fact, while arguing about the type of evidence that should be permitted regarding the crimes against Cynthia W., defense counsel acknowledged, "The fact that Mr. Dworak spent time in prison for that conviction is appropriate." In *Falsetta*, we explained that "the prejudicial impact of the evidence is reduced if the uncharged offenses resulted in actual convictions and a prison term, ensuring that the jury would not be tempted to convict the defendant simply to punish him for the other offenses, and that the jury's attention would not be diverted by having to make a

separate determination whether defendant committed the other offenses." (*Falsetta*, *supra*, 21 Cal.4th at p. 917, italics omitted.) The fact of Dworak's release on parole might have been relevant to the Evidence Code section 352 inquiry if Dworak had raised it at the time. But it would not have precluded the trial court from finding the prior crimes evidence more probative than prejudicial.

In sum, we cannot say that the trial court's approach, even if not the only approach available, was an abuse of discretion.

### 2. *Instructional Claim*

Dworak also contends that the trial court erred when it instructed the jury with CALJIC No. 2.50.01 before and after Cynthia W.'s testimony. As given, CALJIC No. 2.50.01 provided in relevant part: "If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crimes of which he is accused. [¶] However, if you find beyond a reasonable doubt that the defendant committed prior sexual offenses, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crimes. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence ultimately received in this trial, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crimes. [¶] Unless you are otherwise instructed, you must not consider this evidence for any other purpose."

Dworak objects to the reference to "charged crimes," in the plural, because the prosecutor offered two theories of first degree murder — felony-murder in the commission of rape and malice murder — and the evidence could not permissibly be considered for the latter offense. As explained in *People v. Walker* (2006) 139 Cal.App.4th 782, "murder, standing alone (Pen. Code, § 187, subd. (a)), is not one of the offenses enumerated in [Evidence Code] section 1108" for which prior sexual offenses may be admitted, and first degree murder under a malice murder theory does not "involve as one of its necessary adjudicated elements deriving sexual pleasure or gratification from inflicting death, bodily injury or physical pain on his victim." (*Id.* at pp. 798, 802.) In other words, while propensity evidence of prior sexual offenses can be considered in determining whether a defendant has committed felony murder where the underlying felony was a sexual offense (*People v. Story* (2009) 45 Cal.4th 1282, 1294), such evidence cannot be used to infer that a defendant has committed a murder without an underlying sexual offense (*Walker*, at p. 798). On this basis, Dworak argues the trial court erred in instructing the jury that evidence of his prior sexual offenses may be used to find that he "was likely to commit and did commit the crimes of which he is accused [which includes malice murder]." (CALJIC No. 2.50.01.)

Assuming Dworak did not forfeit this claim by failing to object at trial and thereby provide the trial court an opportunity to consider whether a modification to the instruction might be appropriate (see *People v. Riggs* (2008) 44 Cal.4th 248, 309; *People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012), he still cannot show prejudice. The jury found Dworak guilty of rape and found the rape-murder special circumstance to be true.

Thus, the jury necessarily found him guilty of felony-murder —
an offense for which the proffered evidence could properly be
considered.

### E. Testimony Regarding Susannah Dworak

Over Dworak's objection, the court permitted two
witnesses to testify to the demeanor of Dworak's wife,
Susannah, around the time of Hamilton's death, from which the
prosecutor argued it could be inferred that Dworak and his wife
had fought and that Dworak was angry and sexually frustrated
the weekend Hamilton died, leading him to seek nonconsensual
sex.

The office administrator for the oral surgery group where
Susannah worked testified that Susannah did not work on
Friday, April 20. She further testified that Susannah called in
that day to say she was taking a vacation day and would not be
in to work, and that Susannah was "upset" and "crying" during
that call. A second coworker testified that she, Susannah, and
two other employees attended a job certification conference that
weekend in Irvine. This coworker testified that Susannah was
"quite upset," adding that "[Susannah] had a rough day Friday,
evidently, and she was, you know, very upset, very emotional,
and she showed signs of that."

The testimony from Susannah's coworkers linked the
prosecutor's theory that Dworak sought nonconsensual sex the
night of Hamilton's murder with his own statements to
investigators that when he and Susannah were not getting
along, he would become sexually frustrated and would seek out
sexual encounters. The prosecutor relied on this testimony
during closing argument to characterize Dworak as "angry,"
adding that "you know that he and his wife got in a huge fight

that weekend" and that Susannah "called in to work, crying and upset," and was upset the whole weekend. The prosecutor continued, "And suddenly, [Dworak's] anger at his wife, his complaints about how he doesn't get to do anything and his glee about his wife being out of town, talking . . . about how when the cat's away, the mouse can play, suddenly, that all makes much more sense. He's got the motive. He's got the desire. And now he's got the opportunity to do what he did to Crystal Hamilton." The prosecutor returned to the same point repeatedly in her argument.

Dworak objected to this testimony on the grounds that it was irrelevant and more prejudicial than probative. Specifically, Dworak argues there was no evidence as to the reason why Susannah was upset. But Dworak's own statements to investigators that he and Susannah were having marital problems around the time of Hamilton's death, that Susannah was "just a raging bitch basically," and that they were fighting "all the time," as well as his neighbor's testimony that Dworak regularly complained that Susannah nagged him and was "riding his case," provided a basis from which the jury could rationally infer that Susannah was upset because she and Dworak had been fighting and that Dworak therefore had a motive to seek nonconsensual sex on the weekend of Hamilton's death. In light of this other evidence and the prosecutor's case as a whole, we cannot say that the trial court erred in finding this testimony — consisting of five lines of testimony from two minor witnesses — more probative than prejudicial.

## F. Testimony from Victim's Father

Dworak contends the trial court erred in permitting the prosecutor to elicit testimony from the victim's father,

Lieutenant Colonel Hamilton, about her future plans in violation of state evidentiary rules and his confrontation right under the federal Constitution. We conclude that the trial court properly admitted the evidence under the exception to the hearsay rule set forth in Evidence Code section 1250.

During Lieutenant Colonel Hamilton's testimony, the prosecutor asked whether Crystal had spoken to him about her future. Dworak objected, and a hearing was held at sidebar. The prosecutor explained that based on Dworak's opening statement that Hamilton was neither raped nor murdered, "it appears as though there will be an implication that this could have been either a suicide or an accidental death wherein Crystal wandered off out into the ocean or did something to — that amounts to taking her own life." The trial court overruled Dworak's hearsay objection, explaining that such testimony "would certainly be probative if in fact she is discussing with her dad future plans to either continue her education or other career-related activities, things of that nature which would suggest that she would not be a person, as far as [Lieutenant] Colonel Hamilton might know, that might be inclined to do something to hurt herself." Defense counsel then clarified that it was "never the intent of the defense in this matter to raise any kind of issue that this young lady committed suicide, never." The trial court responded that it expected any testimony regarding Crystal's future plans to be very brief, and the prosecutor agreed.

In front of the jury, Lieutenant Colonel Hamilton was again asked whether, in April 2001, Hamilton spoke of her intentions in the "near future." He answered, "There were a couple of things she was looking at. One longer range was college. A shorter range, something in the medical field, and she

thought perhaps the Air Force, air evacuation, flight nurse basically." Dworak never raised any suggestion Hamilton's death may have been the result of suicide, but the prosecutor nevertheless returned to that point in her closing argument: "This girl had been talking about going to college. She had been talking about joining the Air Force, maybe becoming a nurse in the Air Force, who spent all Saturday trying to call her dad to come get her and who does get in touch with her dad to come get her. She tells Matt she's going to be leaving soon. She wants to go home. Suddenly she decides to end it all?"

There is some ambiguity in the record as to the basis upon which the trial court admitted this evidence. After defendant objected on relevance and hearsay grounds, the prosecutor argued that Dworak was "going to attempt to prove this was no murder" and that the prosecution was "entitled to present evidence [in response] that this is not a girl who's planning on taking her own life. She made plans about going to college, getting a job, joining the military. She was a normal, happy kid." Defense counsel responded, "It's hearsay," and the prosecutor replied, "Statement of intention." These comments indicate that the prosecutor sought admission of the statements under the Evidence Code section 1250 hearsay exception, which applies to "a statement of the declarant's then existing state of mind . . . including a statement of intent," (*id.*, subd. (a)) in order to prove the truth of the matter asserted, i.e., Hamilton "made plans about going to college, getting a job, joining the military." The trial court overruled the objection, explaining that the evidence "would certainly be probative if in fact she is discussing with her dad future plans to either continue her education or other career-related activities, things of that nature which would suggest that she would not be a person, as far as

[Lieutenant] Colonel Hamilton might know, that might be inclined to do something to hurt herself." The prosecutor during closing argument relied twice on the truth of Hamilton's statements, describing Hamilton as "[a] young girl with her whole life ahead of her who's thinking about joining the Air Force, going off to college." Other statements in her closing argument adhere more closely to the limited view of the evidence; for example, the prosecutor argued against any idea that Hamilton's death was an accident or suicide, asserting "[t]his girl had been talking about going to college [and] about joining the Air Force, maybe becoming a nurse in the Air Force."

Evidence Code section 1250, subdivision (a) provides in relevant part that "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan . . . ) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." "If offered to prove the declarant's state of mind, the statement may be introduced without limitation, subject only to [Evidence Code] section 352." (*People v. Ortiz* (1995) 38 Cal.App.4th 377, citing *People v. Noguera* (1992) 4 Cal.4th 599, 622.)

Although the record is not as clear as it might be, it appears the trial court admitted the evidence under the hearsay exception set forth in Evidence Code section 1250. There is no error here, as Hamilton's state of mind was fairly at issue to the extent there may have been some question as to whether she committed suicide. Her statements to her father regarding future plans, to the extent they were true, were probative of her

disinclination to commit suicide. Under the hearsay exception set forth in Evidence Code section 1250, the statements were admissible as to their truth, and the prosecutor was entitled to rely on the truth of the statements in his closing argument.

Evidence admitted under Evidence Code section 1250 is subject to the limitation set forth in section 1252, which provides: "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness." "A statement is trustworthy within the meaning of section 1252 of the Evidence Code when it is ' "made in a natural manner, and not under circumstances of suspicion." ' " (*People v. Harris* (2013) 57 Cal.4th 804, 844, quoting *People v. Ervine* (2009) 47 Cal.4th 745, 778–779.) As in *Harris*, there is no indication that the statements at issue were made under coercion or "with an intent to deceive." (*Harris*, at p. 844.) We find no abuse of the court's discretion in allowing this brief testimony regarding Hamilton's statements of her future plans.

In addition to his state law evidentiary claim, Dworak contends that the trial court's erroneous admission of this hearsay testimony violated his right to confrontation and due process under the federal Constitution. (U.S. Const., 5th, 6th, 14th Amends.) Because the statements were admitted for their truth, the confrontation clause right as articulated in *Crawford v. Washington* (2004) 541 U.S. 36, 53–54, is implicated. As Crawford explained, "admission of testimonial statements of a witness who did not appear at trial" is not permitted unless the witness "was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Ibid.*) The issue was not litigated below; however, there is no evidence indicating that the statements were "testimonial" hearsay as the United

States Supreme Court has delineated that term. Hamilton's statements "were not made to law enforcement officers, nor were they otherwise made under circumstances suggesting a primary purpose of creating evidence for defendant's prosecution." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1217.) The statements were therefore not testimonial and do not implicate the confrontation right.

Even if we were to assume error, it would be harmless beyond a reasonable doubt. The testimony at issue comprised just 13 lines of testimony. Dworak notes only two instances in which the prosecutor referred to this evidence during her closing argument; in each case, it was coupled with other evidence suggesting Hamilton did not intend to harm herself, including her repeated telephone calls to her father to secure a ride home. Moreover, the pathology evidence showing evidence of premortem wounds, coupled with expert testimony that Hamilton's death followed shortly from intercourse with Dworak, belies any notion that her death was self-inflicted. We see no reasonable possibility that the jury would have returned a verdict more favorable to Dworak without this brief testimony.

## G. Alleged Instructional Error

Dworak contends that the trial court erroneously instructed the jury on consciousness of guilt evidenced by willfully false statements. We reject the claim.

The court instructed the jury with the language of CALJIC No. 2.03: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient

by itself to prove guilt, and its weight and significance, if any, are for you to decide." Although Dworak lodged a blanket objection to all instructions as given, he made no specific objection to this instruction.

Dworak contends that this instruction improperly duplicated more general circumstantial evidence instructions, was unfairly partisan and argumentative, permitted the jury to draw an irrational inference about his guilt, and intruded upon the jury's factfinding function. Dworak acknowledges that we have rejected substantially similar challenges. (See, e.g., *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 653 [collecting cases].) Even assuming the argument is not forfeited, Dworak offers no persuasive reason for us to reconsider these conclusions.

## H. Prosecutorial Misconduct

Dworak contends the prosecutor committed misconduct by denigrating defense counsel and witnesses. We reject this claim.

During her closing argument, the prosecutor addressed the opinion from the defense expert, Dr. Bux, that Hamilton was not raped. She described Dr. Bux as a "hired mouthpiece, really, who would say what they pay him to say," characterized his opinion as one "bought by the defense," and added that "[f]or $3,600, defendant bought an outrageous, antiquated and preposterous opinion about rape." Further, in mentioning the fact that Dr. Bux agreed Hamilton suffered injuries premortem yet said he did not see evidence of a violent struggle, the prosecutor said: "Well, I guess for $3,600, people will say contradictory things." Dworak's counsel objected to the first and third of these statements, but the trial court overruled both objections on the ground that counsel has wide latitude in argument.

35

In response to the prosecutor's statements, Dworak's counsel declared in his closing argument: "I know that the prosecution did not mean to imply that Mr. Farley, Ms. Duffy, or I committed a grade one felony when we called Dr. Bux on the phone and said, 'Dr. Bux, for $3,600, would you please come out from Colorado to Ventura to spoon-feed perjury to a jury?' Ladies and gentlemen, that's a serious felony, suborning perjury. And we don't do that."

" ' "To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm." ' " (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 480.) Although Dworak made timely objections to two of the statements at issue, he did not request an admonition of the jury. Dworak argues that requesting an admonition would have been futile and therefore was unnecessary to preserve this issue for review. The "general rule" requiring objection and request for admonition to preserve a misconduct claim does not "apply when the trial court promptly overrules an objection and the defendant has no opportunity to request an admonition." (*People v. McDermott* (2002) 28 Cal.4th 946, 1001.) This exception applies to both the "hired mouthpiece" and "outrageous, antiquated and preposterous opinion" statements made by the prosecutor about Dr. Brux set forth above. Dworak did not object to the prosecutor's use of the phrase "bought by the defense" or "contradictory statements," both of which occurred close in time to the statements Dworak did object to. For that reason, we will assume for the sake of argument that the entirety of this claim is properly presented. Even so, we

conclude that the statements at issue do not amount to prosecutorial misconduct.

" ' "Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' " ' " (*People v. Sattiewhite*, *supra*, 59 Cal.4th at p. 480.) Misconduct that falls short of a federal due process violation may nevertheless violate state law if it "involves the use of deceptive or reprehensible methods to persuade the court or jury." (*People v. Watkins* (2012) 55 Cal.4th 999, 1031.) In evaluating such a claim, we are cognizant that " '[a] prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence.' " (*People v. Dykes* (2009) 46 Cal.4th 731, 768.) We review claims of prosecutorial misconduct under an abuse of discretion standard (*People v. Alvarez* (1996) 14 Cal.4th 155, 213), asking whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion (*People v. Edwards* (2013) 57 Cal.4th 658, 734).

Dworak contends that the prosecutor's statements amounted to prosecutorial misconduct because "she suggested to the jury it should in effect disregard Dr. Bux's testimony because defense counsel had paid him to say what counsel wanted him to say." We rejected a similar claim in *People v. Cook* (2006) 39 Cal.4th 566, 614. In *Cook*, the prosecutor commented on the fees paid to a defense expert witness, stating " 'for 124 hours at $225 per hour, Dr. Wilkinson comes up with something that excuses this man's responsibility.' " (*Id.* at p. 613.) The defendant argued that this statement "impugn[ed] defense counsel's integrity for having, in effect, bought the

expert's testimony." (*Id.* at pp. 613–614.) Although the claim was forfeited by the defendant's failure to object at trial, we went on to explain that "although counsel may not denigrate the integrity of opposing counsel, an attorney is free to argue that the opinions of paid expert witnesses may be biased." (*Id.* at p. 614; see also *People v. Parson* (2008) 44 Cal.4th 332, 360 ["a prosecutor 'is free to remind the jurors that a paid witness may accordingly be biased and is also allowed to argue, from the evidence, that a witness's testimony is unbelievable, unsound, or even a patent "lie" ' "].) Similarly here, it is not likely that the jury took the prosecutor's statements regarding the expert witness's payment to mean defense counsel lacks integrity because he paid an expert to say anything he wanted.

Dworak relies on *People v. McLain* (1988) 46 Cal.3d 97 for the proposition that it is impermissible for a prosecutor to argue that defense counsel fabricated a defense and procured a witness's perjury. But the prosecutor's actions here stopped short of the actions in *McLain*, where the prosecutor outright stated defense counsel shopped around and found somebody willing to come in and lie. (*McLain*, at p. 112.) The prosecutor did use hyperbolic language in calling the expert a "hired mouthpiece," but we have said that using colorful or hyperbolic language generally will not by itself establish prosecutorial misconduct. (See *People v. Peoples* (2016) 62 Cal.4th 718, 793.)

## I. Review of Sealed Material

Before and during trial, the court denied Dworak access to a witness's medical records following an in camera review. Dworak now asks this court to review those records to determine whether the trial court abused its discretion in denying him

discovery of the records. We find no error in the trial court's ruling.

### 1. Background

As discussed, Dworak's neighbor testified about her interactions with Dworak in April 2001. Before trial, the prosecutor moved to exclude evidence relating to the witness's treatment for Vicodin addiction at a treatment hospital in November 2004. Dworak subpoenaed all of the witness's psychological and psychiatric records from the hospital in order to determine whether the severity of her addiction would have affected her ability to perceive and recollect events from that time period. The court agreed that such evidence would be relevant and ordered the hospital to deliver the records under seal to the court.

After reviewing the records, the trial court ruled that Dworak was not entitled to pretrial discovery of the records. Citing *People v. Hammon* (1997) 15 Cal.4th 1117 (*Hammon*), the court balanced Dworak's right to cross-examination against the privacy interest in those medical records and concluded that disclosure was not warranted at that time, saying that while "there may be a very slight bit of information that would be of assistance to [Dworak] in this matter[,] . . . I can't overemphasize how slight that information is." The court added that it would revisit the issue depending on the scope of Dworak's opening statement and his cross-examination of the witness.

During the cross-examination of this witness, defense counsel asked, "With regard to the Vicodin that you were taking at the time that you had this conversation with Mr. Dworak in which he stated that he had been out in Ventura in 2001, with

regard to the strength of the Vicodin, do you recall what the strength was, the milligrams?" She replied, "Five milligrams, between five and 7.5." Based on this testimony, Dworak renewed his request for access to the records. The court denied the request, explaining that "having heard the testimony of the witness now and also the opening statements of both sides, the Court's view is that the material that is contained in the records themselves is of such slight value to the defense in terms of cross-examination of the witness that it is not — that in balancing the right of the defense to her right of privacy, it is not something that would be discoverable under the facts of this case since it is apparently the stipulation between the parties that there was, in fact, sexual intercourse between Mr. Dworak and the decedent in this matter." The trial court later held an in camera hearing outside the presence of the jury and counsel regarding these records, the transcript of which was ordered sealed.

### 2. *Discussion*

Dworak does not contest the trial court's decision to review the psychological and psychiatric records at issue in camera, acknowledging that Evidence Code section 1014 generally privileges confidential communication between a patient and his or her psychotherapist. (Cf. *Hammon, supra,* 15 Cal.4th at pp. 1127–1128 [psychiatric material is not generally discoverable prior to trial]; *People v. Gurule* (2002) 28 Cal.4th 557, 592 [same].) Instead, Dworak contends that this court should independently review the records to determine whether the trial court abused its discretion when it did not provide him with access to these records. The Attorney General does not object to this request, although both parties request an

opportunity to provide supplemental briefing if the court finds any error.

"Parties who challenge on appeal trial court orders withholding information as privileged or otherwise nondiscoverable 'must do the best they can with the information they have, and the appellate court will fill the gap by objectively reviewing the whole record.' " (*People v. Price* (1991) 1 Cal.4th 324, 493; see *People v. Landry* (2016) 2 Cal.5th 52, 74.) We have reviewed the records and agree with the trial court's assessment that they contain little of any plausible value to the defense. The trial court did not abuse its discretion in rejecting disclosure of the materials.

## J. Guilt Phase Cumulative Error

Dworak asserts that the combined errors during the guilt phase warrant reversal of his conviction. With respect to the guilt phase, we have assumed for sake of argument that the trial court's instruction pursuant to CALJIC No. 2.50.01 erroneously permitted the jury to consider the evidence of Dworak's prior sexual assault conviction as propensity evidence as to the nonsexual offense of malice murder. Having found no prejudice from this assumed error, we reject Dworak's cumulative error claim.

## III. PENALTY PHASE CLAIMS

### A. Evidence and Argument Regarding Lack of Remorse

Dworak claims the trial court erred by allowing evidence and argument suggesting Dworak lacked remorse for the crimes. The prosecutor arguably crossed the line by briefly arguing that evidence of lack of remorse constituted aggravating

evidence in this matter. But we need not resolve the latter question because any error was harmless.

Before the penalty phase, Dworak moved to exclude any evidence suggesting he lacked remorse. The trial court tentatively denied the motion with respect to "acts or conduct at the immediate scene of the crime . . . versus post-crime evidence" but cautioned the prosecutor that "argument in this area can become a mine field."

During the prosecutor's case in aggravation, she solicited testimony from Dworak's mother-in-law (over Dworak's objection on the ground of relevance) that she saw Dworak "laugh and joke and be happy between April of 2001 [when Hamilton was killed] and July 2003 [when Dworak was arrested]." In a similar vein, the prosecutor asked Dworak's wife, "Did you ever in between April 22nd of 2001 and July of 2003 see any sign of what you would call remorse in your husband." The trial court sustained Dworak's objection on the ground of speculation. The prosecutor repeatedly referred to this evidence during her closing argument to suggest Dworak lacked remorse for the crimes.

We have routinely held that evidence of lack of remorse is admissible so long as it does not amount to a direct or indirect comment on the defendant's invocation of the right to silence. (*People v. Lewis* (2001) 25 Cal.4th 610, 674; *People v. Bemore* (2000) 22 Cal.4th 809, 855; *People v. Stansbury* (1993) 4 Cal.4th 1017, 1067–1068, revd. on another ground *sub nom. Stansbury v. California* (1994) 511 U.S. 318.) Dworak asks us to reconsider those decisions but provides no reasoned basis for us to do so. We adhere to our prior decisions and find no error in admitting

the testimony elicited by the prosecutor during cross examination of Dworak's wife and mother-in-law.

But Dworak also claims the prosecutor overstepped by relying on evidence during closing argument as an aggravating factor. Lack of remorse is not a statutory aggravating factor. (§ 190.3; see *People v. Ochoa* (2001) 26 Cal. 4th 398, 449, overruled on another point in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14.) As a result, a prosecutor may not argue lack of remorse as an aggravating factor at the penalty phase. (*People v. Dalton* (2019) 7 Cal.5th 166, 264.) The prosecutor may, however, point to a defendant's lack of remorse for the purpose of demonstrating the absence of a mitigating factor. (See *People v. Ghent* (1987) 43 Cal.3d 739, 771.)

Some of the prosecutor's comments suggesting a lack of remorse were offered in the appropriate context of negating the existence of certain mitigating factors. For example, the prosecutor permissibly referred to the testimony of Dworak's wife and mother-in-law on how "wonderful and happy-go-lucky the defendant was" to demonstrate a lack of mitigating section 190.3, factor (d) evidence, i.e., whether the defendant committed the crime while under the influence of extreme mental or emotional disturbance.

Although prosecutors can argue lack of remorse and point to facts in the record that show the defendant was not remorseful, they must take care not to suggest that lack of remorse can be considered in aggravation. Other comments from the prosecutor appeared to argue a lack of remorse as evidence in aggravation. For example, after explaining to the jury that she was transitioning to evidence in aggravation, the prosecutor returned to the point that "while Crystal Hamilton's

father is making that awful phone call to her grandparents telling them what had happened to her, the defendant is in Oak View playing checkers with his mother-in-law telling jokes."

More troubling, the prosecutor alluded to defendant's lack of remorse during his interview with detectives two years after the crime as part of her argument regarding her case in aggravation: "Two years later when the police talk to him about his crime, when they show him a picture of her, what does he do? Does he break down sobbing and apologizing for what he's done? For what happened that night? Does he admit everything that we know he did to her but explain it in some way, give some explanation that mitigates what he did to her? No, no, no, no. He lies and lies. Turns on the manipulation, turns on the charm, 'cause that's his character." Dworak did not raise any objections to the statements made by the prosecutor when discussing evidence in aggravation.

In the absence of prejudice to the fairness of a trial, a prosecutor's errant remarks do not require reversal. (*People v. Bolton* (1979) 23 Cal.3d 208, 214.) "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman v. California* (1967) 386 U.S. 18, 24.) Here, we need not resolve whether the prosecutor's statements rise to the level of prosecutorial misconduct because we find no reasonable possibility that the error affected the jury's death verdict. The bulk of the prosecutor's case in aggravation concerned other evidence in support of a death verdict, including the circumstances of the crime and Dworak's prior instances of violent criminal conduct including rape and forcible sexual penetration with use of a knife. In the context of the prosecutor's argument as a whole, the passing comments about the

defendant's conduct and demeanor in the time period following the crime did not compromise the fairness of the trial. (See *People v. Brown* (2003) 31 Cal.4th 518, 554 [harmless misconduct where prosecutor's remarks "were brief and fleeting, asserting nothing the evidence did not already suggest"].) We conclude that any error in this line of argument was harmless beyond a reasonable doubt.

### B. Victim Impact Evidence

As noted, the prosecutor presented victim impact testimony about the effect of Hamilton's death on her family as evidence of the circumstances of the capital crime (§ 190.3, factor (a)) and about the effect of Dworak's acts on Cynthia W. as evidence of use of force and violence and prior felony conviction (*id.*, factors (b), (c)). Dworak does not contend that the evidence offered here was especially inflammatory or beyond the bounds of what we have generally recognized is permissible penalty phase evidence. Instead, he presents three general challenges to the admission of victim impact evidence at the penalty phase of the trial, asking us to reconsider our prior rejection of those claims in order to preserve the issues for later federal review. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 303.)

First, Dworak argues that victim impact testimony must be limited to witnesses who were present at the crime. Second, he argues that victim impact testimony must be limited to characteristics of the victim known to the defendant at the time of the crime or those that reasonably should be known. And third, he argues that victim impact testimony must be restricted to testimony relating to the victim of the capital crime. We have repeatedly rejected each of these claims. (See, e.g., *People v.*

*Duong* (2020) 10 Cal.5th 36, 73 [questioning whether evidence of the circumstances of a noncapital crime and its direct aftermath on the victim of that crime constitutes victim impact evidence as it is traditionally understood and, in any event, finding no error]; see also *People v. Tully* (2012) 54 Cal.4th 952, 1031 [collecting cases].)  Dworak provides no persuasive reason to depart from these precedents, and we decline to do so.

### C.  Cumulative Error

As noted, Dworak asserts that the combined errors during the guilt and penalty phase warrant reversal of his conviction, his death sentence, or both.  Reviewing both the guilt and penalty phase claims, we have assumed for sake of argument that the trial court's guilt phase instruction pursuant to CALJIC No. 2.50.01 erroneously permitted the jury to consider the evidence of Dworak's prior sexual assault conviction as propensity evidence as to the nonsexual offense of malice murder; and we have assumed that the prosecutor erred in her penalty phase argument by referring to evidence suggesting a lack of remorse as a factor in aggravation.  We conclude that their cumulative effect does not rise to the level of prejudice necessary to reverse Dworak's conviction or his sentence.

### D.  Constitutional Challenges to the California Death Penalty

Dworak raises myriad challenges to the constitutionality of California's death penalty regime.  While he acknowledges we have consistently found similar claims to be meritless, he nevertheless asks us to reconsider our precedent.  We decline to do so.

Dworak contends that California's capital punishment scheme violates the Eighth Amendment because it "fails to

provide a meaningful and principled way to distinguish the few defendants who are sentenced to death from the vast majority who are not." We decline to revisit our precedent holding that section 190.2 as construed by this court "adequately performs the constitutionally mandated narrowing function" (*People v. D'Arcy* (2010) 48 Cal.4th 257, 308) and that our state death penalty statute is not unconstitutional for "failing to require intercase proportionality review or disparate sentence review" (*People v. Eubanks* (2011) 53 Cal.4th 110, 154).

Both this court and the high court have held that the current application of section 190.3, factor (a), is constitutional. (*Tuilaepa v. California* (1994) 512 U.S. 967, 976; *People v. Erskine* (2019) 7 Cal.5th 279, 303–304; *People v. Johnson* (2016) 62 Cal.4th 600, 655; *People v. Rountree* (2013) 56 Cal.4th 823, 860.) "Nor is the death penalty statute unconstitutional for not requiring 'findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence.' " (*People v. Suarez* (2020) 10 Cal.5th 116, 190, quoting *People v. Rangel* (2016) 62 Cal.4th 1192, 1235.)

Though he did not object below, Dworak now argues that CALJIC No. 8.85 was constitutionally deficient because it failed to delete inapplicable sentencing factors, failed to delineate between aggravating and mitigating factors, contained vague and ill-defined factors, and limited some mitigating factors with adjectives such as "extreme" and "substantial." We have previously rejected each of Dworak's arguments regarding CALJIC No. 8.85, and he offers no reasoned basis to reconsider our prior decisions. (See *People v. Mickel* (2016) 2 Cal.5th 181, 220.)

Finally, we decline to reconsider our holding that "California's use of the death penalty does not violate international law, the federal Constitution, or the Eighth Amendment's prohibition against cruel and unusual punishment in light of 'evolving standards of decency.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 590.)

## CONCLUSION

We affirm the judgment.

**LIU, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Dworak

---

**<u>Procedural Posture</u>** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S135272
**Date Filed:** July 15, 2021

---

**Court:** Superior
**County:** Ventura
**Judge:** Kevin J. McGee

---

**Counsel:**

Diane Nichols, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Lance E. Winters, Assistant Attorney General, Jaime L. Fuster and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Diane Nichols
Attorney at Law
P.O. Box 2194
Grass Valley, CA 95945
(530) 477-7462

Viet H. Nguyen
Deputy Attorney General
300 South Spring St., 5th Floor
Los Angeles, CA 90013
(213) 269-6125