Filed 8/25/22  P. v. Ebarb CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSHUA MICHAEL EBARB,<br><br>    Defendant and Appellant. | H048407<br>(Santa Clara County<br>Super. Ct. No. C1885199) |

## I.  INTRODUCTION

Defendant Joshua Michael Ebarb was convicted by jury of a lewd act on a child under the age of 14 (Pen. Code, § 288, subd. (a)).  The trial court placed defendant on probation with various terms and conditions, including that he may not socialize with anyone who has physical custody of a minor unless approved by the probation officer. The court also ordered defendant to pay a criminal justice administration fee of $129.75.

On appeal, defendant contends that:  (1) the trial court abused its discretion and violated his right to due process by admitting evidence of uncharged sexual misconduct; (2) the probation condition prohibiting him from socializing with a person who has custody of a minor is unconstitutionally overbroad and vague; and (3) the criminal justice administration fee must be vacated based on a change in the law that went into effect after he was sentenced.

For reasons that we will explain, we will order (1) the probation condition restricting socialization be modified and (2) the portion of the criminal justice administration fee that remained unpaid as of July 1, 2021 be vacated. We will affirm the order of probation as so modified.

## II. BACKGROUND

### A. *Pretrial Motions in Limine*

The victim in this case was a relative of defendant. Prior to trial, the prosecutor filed a motion in limine to admit evidence of defendant's sexual misconduct with his sister, C. Doe, under Evidence Code section 1108[1] and under section 1101, subdivision (b) regarding intent and the absence of mistake. Defendant filed motions in limine to exclude the evidence and requested a section 402 hearing. Under sections 1108 and 352, defendant contended that the uncharged conduct had minimal probative value because it involved different conduct than the charged offense, was remote in time, was too inflammatory, and involved the danger of jury confusion and a jury's desire to punish defendant for the uncharged conduct. Under section 1101, defendant contended that neither intent nor mistake was reasonably in dispute and therefore the uncharged conduct should not be admitted.

The trial court concluded that evidence of defendant's alleged misconduct against C. when he was 14 years or older was admissible under sections 1108 and 1101, subdivision (b). After an evidentiary hearing, the court further determined that defendant appreciated the wrongfulness of his conduct when he was under 14 years old, and that therefore some of his conduct against C. while he was under 14 was admissible under section 1108.

---

[1] All further statutory references are to the Evidence Code unless otherwise indicated.

**B. *The Prosecution's Case***

**1. Charged Offense**

The victim, N. Doe, was 12 years old at the time of trial in November 2019. The victim's father and defendant are cousins. Prior to the incident, N. referred to defendant as her uncle. N. lived out of state with her immediate family, and defendant lived in California. Until the incident, N. had a good relationship with defendant. N. had taken trips with defendant while in the company of her mother or her father.

In June 2017, when N. was 10 years old, she was allowed to visit defendant in California without her parents. On the night of the alleged incident, N. was watching a movie at defendant's residence with defendant and his son, who was one year younger than N. N. testified that she was lying on the couch next to defendant when she fell asleep. She later clarified at trial that she was "half-awake, half-asleep" or "about to fall asleep." Defendant's son was sleeping on the floor. N. testified that she was on her stomach and that she felt a hand touch her from behind. Specifically, she felt defendant's hand touching over her shorts by her "private area," meaning the part of the body she uses to go "No. 1" in the bathroom. N. testified that she "woke up," started crying, and wanted her mom. N. thought she could trust defendant and felt scared.

N. admitted that she was a "heavy sleeper." She also acknowledged that she had had a "lucid dream" in the past where she felt like she was "inside a dream." The dream occurred years ago, and it was not a scary dream.

N. told defendant that she had a bad dream and that she wanted to call her mother. N. testified that she did not actually have a bad dream. She only stated this to defendant so he would not be "suspicious." N. testified that defendant let her use his phone to talk to her mother. N.'s mother testified that during the phone call, N. was distraught, crying hysterically, and saying that she missed her mother. N. testified that she did not tell her mother at that point what had happened because she was scared defendant was going to "do something else."

3

The next day, N., defendant, his mother, and his son went to Yosemite for a few days. During the trip, N. felt "unsafe" and "a little bit" scared. She testified that she was "uncomfortable" around defendant, she tried not to get close to him, and she would not play a video game with him.

At the end of the trip, which lasted a few days, the group drove N. to her mother's house. N.'s mother testified that N. asked to talk to her alone in a room. N.'s mother could not recall another instance when N. had asked to talk privately with the door shut. N. disclosed that defendant had touched her private area, that he had a phone, that she saw a flash and heard a click, and that she assumed he was taking a picture of her private area. N. was distraught when she made the disclosure. In response to her mother's inquiries, N. indicated that defendant had touched her vaginal area and on her "rear end."

Before N. made the disclosure, N.'s mother knew that defendant's sister had accused him of something similar. N.'s mother was not aware of anything happening as a result of the sister's allegations. N. had also heard the rumors about defendant touching his sister.

N.'s mother called N.'s father and law enforcement. N.'s father immediately called defendant. N.'s father testified that when he initially asked defendant about the allegations, "there was a long a pause, and then there was denial" from defendant.

N.'s father knew that defendant's sister had accused defendant of inappropriate touching. N.'s father believed that nothing happened in response to those allegations.

After N.'s disclosure, there was some discussion "in the family" about whether defendant's cell phone had a working camera, and there were "people saying that he didn't." In particular, defendant's mother had said that defendant's phone did not have a "flash" on it. N. learned about these discussions regarding defendant's camera and the flash.

N. was interviewed by Alexis Auckenthaler, a forensic interviewer at the Washoe County Child Advocacy Center in Nevada. During the interview, N. reported that

4

defendant rubbed her private parts after she fell asleep on the couch. She stated that she heard a camera flash, that defendant took a picture of her, and that she saw defendant looking at his phone. On the phone, N. saw a picture of her shorts and underwear. N. told Auckenthaler that defendant's mother said the flash on defendant's phone did not work, but N. stated that she and her mother had discussed the possibility that defendant had another phone. N. also indicated that defendant's son had been sleeping in his room during the touching incident.

At trial, N. testified that her memory about the incident was better when she talked to Auckenthaler. When asked about the discrepancy between telling Auckenthaler that she had fallen asleep during the movie at defendant's residence and her trial testimony that she was "half awake, half asleep," N. testified at trial that she had forgotten she was asleep.

N. also told Auckenthaler that she looked at defendant's phone and saw a picture of her front genital area. At trial, N. initially indicated that she had not looked at defendant's phone. She later testified at trial that she was "mistaken" when she said that she had not seen anything on defendant's phone.

When asked at trial about her testimony that she was on her stomach when defendant touched her inappropriately, but that the photograph on defendant's phone purportedly showed her front genital area, N. testified at trial that she "meant the back." She later testified at trial that it was a "mistake" when she told Auckenthaler that the photograph showed her front genital area.

At the preliminary examination, N. testified that after she woke up, defendant had his hands in his lap, and she did not see any phone in his hand.

A psychologist testified as an expert in child sexual abuse accommodation syndrome (CSAAS). The syndrome explains common reactions that children may have to sexual abuse, as well as common patterns that might be seen in children when they disclose the abuse. The five categories of CSAAS are secrecy; helplessness; entrapment

and accommodation; delayed, unconvincing, and conflicted disclosures; and retraction. The syndrome cannot be used to diagnose whether a child has been sexually abused.

## 2.  The Uncharged Conduct

C., who is defendant's sister, was 28 years old at the time of trial.  Defendant is two years older than C.  They also have an older brother who is four years older than C. As children, they lived with their mother.

C. testified that when she was about 9 or 10 years old, and defendant was about 11 or 12 years old, he would pick her up "in a really firm embrace," and her legs would be wrapped around his groin.  Defendant would tell her that he was going to "fly [her] around to different places in the world, which would result in him laying [her] down on different furniture in the house, typically the couch in the living room, or [their] mother's bed in her bedroom."  When he laid her down, it was "usually on [her] back . . . , sometimes on [her] stomach, and then he would . . . rub his genitalia on [her] genitalia," or " 'dry hump' " her.  Defendant "would always have an erection" during these incidents.  The incidents ended when defendant would "quickly" get up and go to the bathroom "and then [C.] would hear the toilet flush."  During the incidents, defendant usually wore basketball shorts, and he "typically" asked C. to wear "specific things," including a "soft two-piece bikini."  C. estimated that the incidents occurred more than 10 times but less than 50 times over an approximately three-year period.  No one else was home when defendant engaged in this conduct.

One night, during the same timeframe, when their mother and older brother were home, defendant asked C. to have a "sleepover" in his room.  During the sleepover, defendant put C. "on top of his groin, . . . in a straddling position."

C. felt confusion and embarrassment during the incidents.  She did not understand the significance of what was happening.

When C. was 16 years old and defendant was around 18 years old, he "started peeping on [her]."  For example, during one incident, C. was in the shower and the

shower curtain was open slightly. The hinges on the bathroom door were rusted, so the door would not completely close. C. saw defendant "standing . . . in the crack of the door where it was open[]." She was startled and screamed, and defendant "took off." In another incident, she had showered and was disrobed in a bedroom when she turned and saw defendant watching her from the doorway.

C. testified that when she was 16 years old, defendant got into her bed at night in his boxers and "tried to spoon [her]." She believed he was "aroused" at the time. C. "shov[ed]" herself up against the wall to get away, and defendant got up and walked out.

When C. was 18 years old, she told her mother about defendant's conduct. When C. was 21 years old, she told her oldest brother and two of her cousins, including N.'s father. In 2012, it was an "open family secret." C. never confronted defendant about his conduct, but another person did. C. was 21 years old at the time. Thereafter, C. received a text message from defendant apologizing. At the time of trial, C. had not spoken to defendant in seven years.

### C. *The Defense Case*

At the time of the incident involving N., defendant's son was almost nine years old. Defendant's son was 11 years old at the time of trial. He testified that on the evening that N. spent the night, he was seated on the couch and awake during the entire movie. N. fell asleep during the movie and woke up after the movie was over. She then walked to the bedroom where she was going to sleep. Defendant's son testified that N. could not fall asleep and started crying because she missed her mother. Defendant came in the room to check on her, and N. used her own phone to call her mother. Defendant's son admitted that it was "somewhat hard to remember" the details of that night.

Defendant's son testified that during the Yosemite trip, N. was "pouting" after defendant told her to put her phone away or pack up because they were leaving. N. said something about defendant that his son did not like. Defendant's son told defendant's mother that "no one talks about [my] dad that way."

7

According to defendant's son, defendant's phone functioned properly but the camera did not work. Defendant's son admitted that he disliked N. because of her allegations, but he denied that he was willing to lie for defendant.

Defendant's mother testified that defendant's camera on his cellphone did not work. She received a phone call from N.'s father around June of 2017, about the allegation against defendant. She told N.'s father that defendant's camera did not work. She heard N.'s father tell N., and N. said, "Oh."

Defendant's mother testified that she took pictures during the trip to Yosemite. In one picture, defendant had his arm around N. N. did not cringe or try to walk away when the picture was taken. For other pictures that included N. and defendant, N. never indicated that she did not want to be in the picture, and she did not seem scared or nervous with defendant. Their rental house for the Yosemite trip had two bedrooms. Defendant's mother asked the kids to sleep with her, but they did not want to. Instead, N. and defendant's son both slept in the same room as defendant. N. did not appear to be scared. N. also played video games with defendant. She appeared happy and not afraid. At the end of the trip, N. was upset that defendant made her put down her cellphone and help pack. N. called defendant "rude." This upset defendant's son, who did not play with N. for about an hour.

Defendant's mother testified that defendant, as a man over 25 years of age, would not sexually molest a child under 12. Defendant's mother was aware of her daughter C.'s accusations against defendant.

Two of defendant's friends testified that defendant, as a man over 25 years of age, would not sexually molest a child under 12 years old.

A licensed private investigator testified that she examined defendant's old cell phone in 2018 and 2019. She was not able to get the phone to take a picture or to make it flash.

8

A clinical and forensic psychologist testified as an expert in performing a psychological evaluation to determine whether a person suffers a character trait for sexual deviance. After conducting a clinical interview of defendant for about an hour, reviewing various records including a police report and court information, and administering psychological tests, the psychologist opined that defendant did not have a character trait for sexual deviance. The psychologist was aware, based on a police report, of defendant's sister's allegations about sexually inappropriate behavior by defendant. The psychologist's opinion about defendant, however, was based on what he told the psychologist and the results of the psychological testing. Based on that information, the psychologist characterized defendant's conduct with his sister as "sexual experimentation" and "consensual behavior" "by two children." The psychologist testified that if the sister's report was true, then that would change the psychologist's opinion and "would make [the psychologist] consider that it could be sexual deviance."

The parties stipulated that the private investigator interviewed defendant's son about one month after the incident. The son reported that he and defendant were on a blanket on the floor while watching the movie.

Defendant did not testify at trial.

**D.** *Verdict and Sentence*

On November 22, 2019, the jury found defendant guilty of a lewd act on a child under the age of 14 (Pen. Code, § 288, subd. (a)). After the jury was excused, the trial court thanked counsel for their professionalism and stated that counsel "had a good trial" and that "[i]t was a very close situation."

At the sentencing hearing on September 3, 2020, the trial court suspended imposition of sentence and placed defendant on probation for five years with various terms and conditions, including that he serve one year in county jail which was deemed served. The court stated that defendant could seek termination of probation after three years of compliance and good behavior. Relevant here, the conditions of probation

9

included that defendant "may not date, socialize or form a romantic relationship with any person who has physical custody of a minor unless approved by the probation officer." The court also ordered defendant to pay, among other amounts, a criminal justice administration fee of $129.75 pursuant to Government Code sections 29550, 29550.1, and 29550.2. The fee and other amounts were stayed by the court pending the prosecutor showing that defendant had the ability to pay.

### III. DISCUSSION

#### A. *Admission of Evidence Regarding Uncharged Conduct Involving C.*

Defendant contends that admission of the evidence of his uncharged misconduct against C. was an abuse of discretion and violated due process. Specifically, he argues that the proffered evidence under section 1108 should have been excluded under section 352, because the uncharged conduct was dissimilar and therefore had little probative value, was remote in time, was more inflammatory, and would likely confuse or distract the jury. Defendant also contends that the proffered evidence should not have been admitted under Evidence Code section 1101, subdivision (b), and should have instead been excluded under section 352, because intent and absence of mistake could not reasonably be disputed by him if he in fact touched N.

#### 1. Proceedings Below

Prior to trial, the prosecutor filed a motion in limine to admit evidence of defendant's sexual conduct with C. under sections 1108 and 1101, subdivision (b). Regarding section 1101, subdivision (b), the prosecutor argued that the evidence was relevant to intent and the absence of mistake.

Defendant filed motions in limine to exclude the evidence and requested a section 402 hearing. Defendant characterized the allegations by his sister as falling into different categories, including: (1) when C. was nine to 10 years old and defendant was 11 to 12 years old, defendant rubbed his genitalia against C. several times and placed her in sexual positions while they were both clothed, (2) when C. was 16 years old and

10

defendant was 18 years old, he would "peep" while she showered and when she was in a room undressed, and (3) defendant would get into bed with her and " 'spoon' behind her."[2]  Under sections 1108 and 352, defendant contended that the evidence was too inflammatory because it involved incest, there was a danger of jury confusion and a desire to punish defendant for the uncharged conduct, the uncharged conduct was remote in time as he was 30 years old now, and the probative value was minimal because of the dissimilarities between the uncharged conduct, particularly the "peeping" and " 'spooning,' " and the charged offense.  Under section 1101, defendant contended that neither intent nor mistake was reasonably in dispute.  If the jury believed he fondled and took a picture of the victim's genital area, innocent intent or mistake could not reasonably be argued.  Defendant contended that admission of the evidence under either section 1108 or 1101 would violate his state and federal constitutional rights to due process.

At the hearing on the motions, regarding section 1108, the prosecutor contended that the incidents involving C. represented a "pattern of conduct" by defendant from when C. was nine or 10 years old to an adult that would be "sufficient to support a [section] 647.6 charge."  Further, similar to the early incidents involving C., the charged offense involved rubbing of the vagina with a 10-year-old relative.  The prosecutor also argued that the incidents involving his sister, which did not involve sex and were therefore not " 'incest,' " were "more innocuous" than the charged offense involving a "grown man rubbing on the vagina of a 10-year-old girl" who was his "second cousin."

Defendant contended that each alleged prior act had to be analyzed under section 352, rather than "just calling it a pattern so it all comes in."  He also argued that

_____

**2** Defendant also identified other categories of allegations by C., including: 1) when C. was 12 to 13 years old, defendant would "peep on her" while she showered when they were in Arizona, and 2) when C. was 21 years old, defendant "peeped on her" while she was showering.  No evidence regarding these alleged incidents was offered at trial, and therefore we do not discuss them further.

11

he was only 11 or 12 years old when the conduct involving C. began, and therefore it was not relevant to his character at the time of the charged offense. Defendant further argued that although the prior conduct did not meet the legal definition of incest, it was still inflammatory because it involved "fooling around with your sister, for example." Regarding section 1101, subdivision (b), on the issue of intent and mistake, defendant contended that if the jury believed he touched the victim, he could not reasonably argue there was no sexual intent or that the touching was a mistake. Therefore, intent and mistake were not at issue and the evidence regarding his prior conduct with C. should not be admitted on those issues. The prosecutor responded that defendant had pleaded not guilty, and therefore "all elements [are] at issue."

The trial court determined that defendant's alleged prior acts with C. could be a violation of Penal Code section 647.6 [annoying or molesting a child under 18 years of age] and therefore fell "within [section] 1108 crimes." The court explained that if there was only a "single event that occurred 17 or 18 years ago," then the "argument about remoteness might be more persuasive." Here, however, there was "a series of events from 17 years ago and continuing on," such that there was "not a sufficient separation for [the court] to say that these things are remote in time." Additionally, the court was not persuaded by defendant's objection about the lack of similarity between the uncharged conduct and the charged offense. The court concluded that evidence of defendant's uncharged conduct against C. when he was 14 years or older would be admissible under sections 1108 and 1101, subdivision (b).

Regarding defendant's conduct against C. when he was under the age of 14, the trial court and the parties discussed the need for an evidentiary hearing to determine whether defendant knew the wrongfulness of his conduct at the time. (See Pen. Code, § 26, subd. One; *People v. Cottone* (2013) 57 Cal.4th 269, 276 [before evidence that the defendant committed an unadjudicated sexual offense before reaching age 14 is admitted under § 1108, trial court must make the preliminary factual determination of whether the

12

defendant knew the conduct was wrongful].)  The court indicated that if it determined that defendant understood the wrongfulness of his conduct for the alleged acts committed while he was under 14 years, those prior alleged acts would be admissible under section 1108.  If the court determined that defendant lacked the requisite knowledge for those alleged prior acts and therefore those alleged acts were not admissible under section 1108, then the court would address whether those acts were admissible under section 1101, subdivision (b).

During trial, outside the presence of the jury, the trial court conducted an evidentiary hearing regarding whether defendant appreciated the wrongfulness of his conduct for the acts he allegedly committed against C. while he was under the age of 14 years.  At the conclusion of the hearing, the court determined that defendant knew the wrongfulness of his conduct when C. was about 9 or 10 years old, and defendant was about 11 or 12 years old.

## 2.  Law

Generally, under "Evidence Code section 1101, subdivision (a) . . . propensity evidence is not admissible to prove a defendant's conduct on a specific occasion. [Citations.]" (*People v. Jackson* (2016) 1 Cal.5th 269, 299.)  However, this "general rule does not 'prohibit[] the admission of evidence that a person committed a crime . . . or other act' to prove something other than a person's 'disposition to commit such an act.' (§ 1101, subd. (b).)" (*People v. Baker* (2021) 10 Cal.5th 1044, 1088 (*Baker*).)  For example, the evidence may be admissible to prove intent or absence of mistake.  (§ 1101, subd. (b).)

"The general rule against admission of 'so-called "propensity" or "disposition" evidence' is also subject to exceptions.  [Citation.]" (*Baker*, *supra*, 10 Cal.5th at p. 1089.)  Relevant here, "section 1108 provides an exception to the general rule and permits evidence that a defendant accused of a sexual offense has committed another sexual offense, potentially showing a propensity to do so.  [Citation.]" (*Ibid.*)  " ' "The

Legislature has determined the need for this evidence is 'critical' given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial. . . ." [Citations.] . . . "With the enactment of [Evidence Code] section 1108, the Legislature 'declared that the willingness to commit a sexual offense is not common to most individuals . . . .' " ' [Citation.]" (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1115-1116, fn. 13.) "Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes. [Citation.]" (*People v. Falsetta* (1999) 21 Cal.4th 903, 915 (*Falsetta*).)

Specifically, section 1108, subdivision (a) states, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses[3] is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." "Evidence Code section 352, in turn, provides that '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' 'In short, if evidence satisfies section 1108, and is not excluded under section 352, admission of that evidence to prove

---

[3] Section 1108 defines sexual offense as "a crime under the law of a state or of the United States that involved any of the following: [¶] (A) Any conduct proscribed by subdivision (b) or (c) of Section 236.1, Section 243.4, 261, 261.5, 262, 264.1, 266c, 269, 286, 287, 288, 288.2, 288.5, or 289, or subdivision (b), (c), or (d) of Section 311.2 or Section 311.3, 311.4, 311.10, 311.11, 314, or 647.6 of, or former Section 288a of, the Penal Code. [¶] (B) Any conduct proscribed by Section 220 of the Penal Code, except assault with intent to commit mayhem. [¶] (C) Contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person. [¶] (D) Contact, without consent, between the genitals or anus of the defendant and any part of another person's body. [¶] (E) Deriving sexual pleasure or gratification from the infliction of death, bodily injury, or physical pain on another person. [¶] (F) An attempt or conspiracy to engage in conduct described in this paragraph." (§ 1108, subd. (d)(1)(A)-(F).)

propensity is permitted.' [Citations.]" (*People v. Dworak* (2021) 11 Cal.5th 881, 899 (*Dworak*).)

" 'By reason of [Evidence Code] section 1108, trial courts may no longer deem "propensity" evidence unduly prejudicial per se,' but trial courts 'must engage in a careful weighing process under [Evidence Code] section 352.' [Citation.] . . . [T]he trial court's determination should be guided by such factors as the 'nature, relevance, and possible remoteness' of the evidence, 'the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.' [Citation.] (*Dworak*, *supra*, 11 Cal.5th at p. 900.)

We review a trial court's rulings under sections 1108, 1101, and 352 for abuse of discretion. (*Dworak*, *supra*, 11 Cal.5th at pp. 899, 900; *Daveggio and Michaud* (2018) 4 Cal.5th 790, 824 (*Daveggio*).) " 'To establish an abuse of discretion, defendant[] must demonstrate that the trial court's decision was so erroneous that it "falls outside the bounds of reason." [Citations.] A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be "established by 'a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' [Citation.]" (*People v. Miracle* (2018) 6 Cal.5th 318, 346-347.)

### 3. Analysis

Defendant contends that the evidence of his sexual misconduct against C. should have been excluded because it was "of an entirely different nature" than the charged offense, was remote in time, was "much more inflammatory," and there was a likelihood that the evidence would confuse or distract the jury.

15

We determine that the trial court did not abuse its discretion in finding that the uncharged conduct against C. was admissible under sections 1108 and 352. Defendant's conduct against C. was substantially similar to the charged conduct regarding N. Both involved defendant (1) rubbing genitalia over clothing, (2) of a female relative, (3) beginning when the female was around 10 years old.

We are not persuaded by defendant's citation to *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*) for the proposition that the similar ages of the victims is not relevant to whether the uncharged offense is probative to the charged offense. In *Harris*, the trial court relied on the fact that the victims were in their "20's or 30's." (*Id.* at p. 740.) The appellate court observed that " 'the 20's or 30's' is a wide age group that includes the majority of the victims of sexual assaults," and therefore this similarity was "not significant." (*Ibid.*) In contrast, in this case, C. and N. were the exact same age, or nearly the same age of 10 years old, at the time defendant engaged in the rubbing of genitals over clothing; they were both young girls, not in their 20's or 30's; and both were related to defendant.

Defendant also attempts to distinguish the conduct involving C. and N. by contending that the charged offense involved the "groping of N. while she was asleep" while in the uncharged conduct, C. knew she was being rubbed on the genitals. These circumstances do not negate the probative value of the uncharged conduct. As we have explained, the uncharged and charged conduct both involved defendant rubbing his young female relatives' genitals over their clothing. Although defendant acted when N. was asleep while he made C. believe it was part of a flying game, any "differences in the manner in which the acts were committed . . . , while potentially relevant, are not dispositive. [Citations.]" (*Dworak*, *supra*, 11 Cal.5th at pp. 901-902.) " ' "[T]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve no purpose. It is enough the charged and uncharged offenses

16

are sex offenses as defined in section 1108." ' [Citations.]" (*People v. Cordova* (2015) 62 Cal.4th 104, 133 (*Cordova*).)

Defendant further argues that the uncharged conduct against C. occurred when he was a minor and was not probative to show that, as an adult, he continued to be attracted to young girls, "especially considering that there were no allegations that [he] committed any other crimes of that nature in the interim." He argues that the prior conduct involving C. was "remote and stale."

As the trial court observed, however, if the uncharged conduct against C. was limited to a single incident, then the "argument about remoteness might be more persuasive." Here, however, defendant's uncharged conduct of flying C. around the house and then rubbing her genitals began when defendant was 11 or 12 years old, and it continued for three years, which would have made him 14 or 15 years old. Defendant again tried to touch or rub C. when she was 16 years old, and he was around 18 years old, in the incident in which he entered her bed and "tried to spoon [her]." The charged offense involving N. occurred in 2017, when defendant would have been 28 years old. Thus, the charged offense with N. occurred 10 to 14 years after defendant's uncharged conduct with C.

"In theory, a substantial gap between the prior offenses and the charged offenses means that it is less likely that the defendant had the propensity to commit the charged offenses. However, . . . significant similarities between the prior and the charged offenses may 'balance[] out the remoteness.' [Citation.]" (*People v. Branch* (2001) 91 Cal.App.4th 274, 285 (*Branch*).) "No specific time limits have been established for determining when an uncharged offense is too remote as to be inadmissible. [Citation.]" (*Id.* at p. 284; see *Cordova*, *supra*, 62 Cal.4th at p. 133 [time gap of 13 and 18 years "does not compel exclusion of the evidence"; "[n]either [§] 352 nor [§] 1108 contains rigid requirements"].) Evidence of uncharged offenses that occurred 15 or 16 years before the charged offenses was found relevant in *People v. Frazier* (2001) 89

17

Cal.App.4th 30, as the evidence showed the defendant had a pattern of molesting his young female relatives going back that far. (*Id*. at p. 41.) In *People v. Soto* (1998) 64 Cal.App.4th 966, the appellate court found that the passage of approximately 20 years did not render evidence of prior similar incidents prejudicial and inadmissible. (*Id.* at pp. 977-978, 990-992.) The appellate court explained that "the propensity evidence was extremely probative of [the defendant's] sexual misconduct when left alone with young female relatives." (*Id.* at p. 991.) In *Branch*, *supra*, 91 Cal.App.4th 274, although the "30-year gap" between the uncharged and charged offenses was "a substantial one," the appellate court concluded that "substantial similarities between the prior and the charged offenses balance[d] out the remoteness of the prior offenses," where the similarities included victims who were both 12-year-old relatives, and the defendant "took advantage of the fact that each victim was staying in his home when the molestations took place." (*Id.* at pp. 284, 285.) Likewise, in this case, the victims of the uncharged and charged offenses were both 10-year-old female relatives who were left at home with defendant when they were inappropriately touched by him. In light of these significant similarities, the trial court could reasonably determine that the uncharged conduct involving C. was relevant to the charged offense, in that they showed defendant's "possible disposition" to commit a sex crime (*Falsetta*, *supra*, 21 Cal.4th at p. 915) involving the touching of the genitals of a young female relative.

We are not persuaded by defendant's contention that the uncharged conduct involving C. was "much more inflammatory" than the charged offense. Both the uncharged and charged offenses involved touching over clothing. Although defendant engaged in a greater number of incidents with C., including two "peeping" incidents, as we have explained the overwhelming majority of the incidents with C. involved the rubbing of genitals, which was the same conduct as the charged offense. Further, as to defendant's argument that C. was his sister and there is a "heavy social stigma associated with incest" (*People v. Tobias* (2001) 25 Cal.4th 327, 337), defendant also acknowledges

18

that "an offense committed by an adult is generally more serious." In this case, the charged offense involved defendant, as an adult, touching the genitals of a young female relative who was left in his care. On this record, we do not believe that the uncharged conduct was "much more inflammatory" than the charged offense as argued by defendant.

Lastly, defendant observes that his conduct involving C. did not result in charges or a conviction. This fact alone, however, did not mandate the exclusion of the uncharged conduct. (See *People v. Johnson* (2000) 77 Cal.App.4th 410, 419, fn. 6.)

In sum, we cannot say that the trial court's conclusion—that the probative value of the uncharged conduct involving C. outweighed its prejudicial effect in establishing defendant's propensity to commit the charged sexual offense involving N.—fell outside the bounds of reason. (§ 1108.) Accordingly, we find that the court did not abuse its discretion in admitting the evidence of the uncharged conduct under sections 1108 and 352. (*Dworak*, *supra*, 11 Cal.5th at pp. 899, 900.)

Defendant also contends that the trial court erred in admitting the evidence of his conduct against C. under section 1101. As we find that the evidence regarding C. was properly admitted under sections 1108 and 352, we need not address defendant's contention that it was inadmissible under section 1101. (See *Daveggio*, *supra*, 4 Cal.5th at p. 823 ["if evidence satisfies the requirements of section 1108, including that it is not inadmissible under section 352, then the admission of that evidence does not violate section 1101"]; §§ 1101, subd. (a), 1108, subd. (a).)

Defendant further contends that the admission of the evidence regarding C. violated his federal right to due process. In support of this argument, he relies on *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378 (*McKinney*). However, we are bound by the California Supreme Court's decision in *Falsetta*, *supra*, 21 Cal.4th at pages 912 to 922 that section 1108 does not violate a defendant's constitutional right to due process. (See also *Falsetta*, *supra*, at pp. 921-922 [finding *McKinney* "inapposite" because it "did

19

not concern the validity of section 1108 . . . nor even involve the admission of evidence of the defendant's other crimes"]; see *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### B. *Probation Condition*

In placing defendant on probation, the trial court ordered that defendant "may not date, socialize or form a romantic relationship with any person who has physical custody of a minor unless approved by the probation officer."  On appeal, defendant contends that the term "socialize" is unconstitutionally overbroad and vague and should be stricken from the condition.  Regarding overbreadth in particular, defendant argues that people with custody of minors "are ubiquitous" and are likely among his coworkers, friends, family members, and neighbors.  He contends that the condition would prohibit him from socializing with them "regardless of whether he has any contact with their children."  Defendant contends that the condition impinges on his freedom of association "far more broadly than necessary to serve the state's interest and the purposes of the condition in protecting children."  Although he did not object to the condition below, defendant contends that this court may consider a facial constitutional challenge for the first time on appeal.

The Attorney General contends that defendant has raised an "as applied challenge," not a facial challenge, to the probation condition and that "when taken out of context" the probation condition "might present problems of overbreadth and vagueness."  The Attorney General argues that the intent of the probation condition is to limit defendant's access to minors, "particularly in situations where he might be seen as having some greater level of trust over potentially vulnerable individuals," and that the condition does not affect his "right to have lunch with his coworkers, to meet with family members, or to attend an 'AA meeting.' "  The Attorney General states, however, to forestall any claim of ineffective assistance, the condition "could . . . be modified to require the term to be read in context with the entire clause, or even omitted altogether, assuming that

20

[defendant's] access to minor children as part of a position of trust would not [be] enhanced."

A defendant may raise for the first time on appeal a facial constitutional defect in a probation condition, where the claim involves " ' "pure questions of law that can be resolved without reference to the particular sentencing record developed in the trial court." [Citations.]' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 889 (*Sheena K.*); see also *id*. at pp. 887-888.) A facial constitutional challenge to the "phrasing or language of a probation . . . does not require scrutiny of individual facts and circumstances but instead requires the review of abstract and generalized legal concepts—a task that is well suited to the role of an appellate court." (*Id*. at p. 885.) In contrast, a constitutional defect that is "correctable only by examining factual findings in the record or remanding to the trial court for further findings" is subject to forfeiture if the claim was not raised in the trial court. (*Id.* at p. 887.) In this case, we need not decide whether defendant has raised a facial or an as-applied challenge. In view of the Attorney General's suggestion to consider the merits, we will consider defendant's claim to forestall an ineffective assistance of counsel claim.

"A probation condition that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad. [Citation.]" (*Sheena K.*, *supra*, 40 Cal.4th at p. 890.) A restriction is unconstitutionally overbroad if it "(1) 'impinge[s] on constitutional rights,' and (2) is not 'tailored carefully and reasonably related to the compelling state interest in reformation and rehabilitation.' [Citations.]" (*In re E.O.* (2010) 188 Cal.App.4th 1149, 1153. "The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights—bearing in mind, of course, that perfection in such matters is impossible, and that practical necessity will justify some infringement." (*Ibid*.)

In this case, the probation condition imposes significant restrictions on defendant's constitutional right to free association and is overbroad with respect to the prohibition on socializing. A similar condition was found overbroad in *United States v. Wolf Child* (9th Cir. 2012) 699 F.3d 1082, 1101 (*Wolf Child*).

In *Wolf Child*, one of the conditions of the defendant's supervised release was that he not " 'date or socialize with anybody who has children under the age of 18' without prior written approval from his probation officer." (*Wolf Child*, *supra*, 699 F.3d at p. 1100, fn. omitted.) In determining that the condition infringed on Wolf Child's right to free association and was overbroad (*id*. at p. 1100), the Ninth Circuit Court of Appeals noted, "[t]he prohibited group includes people close to Wolf Child, such as family members, friends, and neighbors who might have children. It would also include a boss or coworker, a sponsor in a support group, or a spiritual leader. The number of people with whom Wolf Child might socialize, knowing them to have children under the age of 18, is indeed vast. For the 10 years of his supervised release, Wolf Child would be required to obtain prior written approval from his probation officer before, for instance, having dinner with [the mother of his oldest child] on a special occasion, or meeting a close family member or friend for coffee, or going to an AA meeting or a tribal function with others seeking to improve their own lives or their tribe's social conditions generally; he might even find himself prohibited from joining his coworkers in the lunchroom or at a social activity sponsored by his employer." (*Id*. at p. 1101.) The *Wolf Child* court further stated, "It is hard to imagine how Wolf Child would be able to develop friendships, maintain meaningful relationships with others, remain employed, or in any way lead a normal life during the 10 years of his supervised release were he to abide" by the condition that he not date or socialize with anybody who has children under the age of 18. (*Ibid*.) The *Wolf Child* court found the condition "overbroad and thus not sufficiently limited to achieving the goals of deterrence, protection of the public or rehabilitation." (*Id*. at p. 1100.)

The probation condition imposed in this case is designed to prevent defendant from having contact with children.  However, the condition prohibits defendant from socializing with people such as family, friends, and coworkers, even though he may never come into contact with their children.  A restriction on socializing with anybody who has a child under the age of 18, even though defendant may never come into contact with those children, is not carefully tailored to the purpose of the condition.  Simply put, it burdens activity that does not raise a sufficiently high probability of harm to governmental interests to justify the interference.  Thus, we agree that the term "socialize" should be stricken from the condition.  Given our conclusion that the term is unconstitutionally overbroad, we do not need to reach defendant's argument that the term is also unconstitutionally vague.

Accordingly, we will order the probation condition modified to provide: "The defendant may not date or form a romantic relationship with any person who has physical custody of a minor unless approved by the probation officer."

### C. *Criminal Justice Administration Fee*

The trial court ordered defendant to pay a criminal justice administration fee of $129.75 pursuant to Government Code sections 29550, 29550.1, and 29550.2.  The fee along with other amounts were stayed by the court pending the prosecutor showing that defendant had the ability to pay the amounts.

On appeal, defendant contends that the criminal justice administration fee is no longer collectible based on Government Code 6111, subdivision (a).  The Attorney General agrees that any portion of the fee that is unpaid as of July 1, 2021 is not collectible and that defendant "is entitled to have that portion of the judgment pertaining to any unpaid portion of the . . . fee as of that date vacated."  In reply, defendant agrees with this remedy.

Government Code section 6111, which went into effect after defendant was sentenced, states:  "On and after July 1, 2021, the unpaid balance of any court-imposed

23

costs pursuant to . . . subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (*Id*., subd. (a).) In other words, "by its plain terms," Government Code section 6111 "make[s] *any* unpaid portion of the identified assessments, as they existed on June 30, 2021, 'unenforceable and uncollectible' as of July 1, 2021. [Citation.]" (*People v. Greeley* (2021) 70 Cal.App.5th 609, 626 (*Greeley*).) Further, "the statute also mandates that any portion of a judgment imposing those fees be vacated. Accordingly, based on the plain language of the statute, the unpaid balance of the . . . criminal justice administration fee[] must be vacated." (*Id*. at pp. 626-627, italics & fns. omitted.)[4]

## IV. DISPOSITION

The trial court is directed to:

1. Strike the word "socialize" from the probation condition that states, "The defendant may not date, socialize or form a romantic relationship with any person who has physical custody of a minor unless approved by the probation officer," so that the condition instead states, "The defendant may not date or form a romantic relationship with any person who has physical custody of a minor unless approved by the probation officer"; and

2. Vacate the portion of the criminal justice administration fee that remained unpaid as of July 1, 2021.

As so modified, the order of probation is affirmed.

---

[4] We note that the legislation that enacted Government Code section 6111 also repealed the provisions providing for presentence investigation fees and probation supervision fees. (See Pen. Code, § 1465.9, subd. (a); former Pen. Code, § 1203.1b; *People v. Pacheco* (2022) 75 Cal.App.5th 207, 214-215; *Greeley*, *supra*, 70 Cal.App.5th at pp. 625-626.)

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
DANNER, J.

_____
WILSON, J.

*People v. Ebarb*
**H048407**