Filed 3/20/23  P. v. Peters CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CURTIS JAMES PETERS,<br><br>    Defendant and Appellant. | A164084<br><br>(San Mateo County<br>Case No. 21NM005417A) |

After a mistrial, a second jury convicted Curtis James Peters of felony dissuading a witness in violation of Penal Code section 136.1, subdivision (c)(3)[1] for threatening to kill the victim and his family outside their apartment if police were called.  Peters contends (1) the prosecutor committed misconduct during closing argument; (2) the trial court abused its discretion in denying his *Romero* motion to strike his prior conviction under the three strikes law; and (3) recent amendments to section 1170, subdivision (b) require the case be remanded for resentencing.  We remand so that the trial court may consider sentencing in light of section 1170, subdivision (b).  In all other respects, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

1

Near the San Mateo apartment where Cristina M. and Ezequiel H.C. lived with their four children – St., age 9; G., age 8; B., age 4; and S., age 2 – was a laundromat used by the family.

Cristina testified that she had seen Peters several times in and around the laundromat in early 2021 when she went to do laundry but did not know him. On occasion, Peters had spoken with her, but she did not understand English and never responded. Five or six times, Peters had followed her home. This would prompt Cristina to hurry home to put the clothes away and close the door behind her.

One early morning in May 2021, Cristina went to the laundromat and saw Peters there. Later that morning, as was her routine, she took her three younger children out for a scooter ride in the neighborhood. On their way home, they passed the laundromat, where Cristina again saw Peters. The family proceeded home, with G. and B. in the lead, and Cristina and her youngest child trailing.

The entrance to the family's apartment was down a long driveway or alleyway. The older kids turned into the driveway, and Peters followed. When Cristina turned into the driveway, she saw Peters standing by the stairs near their apartment's front door. G. had ditched her scooter and had already moved on to drawing while sitting on the outside stairs. Peters stood nearby and faced G. as she drew.

Cristina hurried inside the apartment to tell Ezequiel about the man outside, leaving the door open for G. She told Ezequiel that the man who hangs around the laundromat and follows her was outside and next to their child. Around this time, Cristina saw Peters at the front door, leaning inside with his head and shoulders leaning into the apartment. He did not say a thing.

Ezequiel, who had been resting, got up and confronted Peters at the front door. Cristina heard him say something to Peters in English, which she did not understand, and saw him take out his phone. While Ezequiel was dealing with Peters, Cristina took one of the kids to a room down the hall. When she returned to bring G. inside, she saw Ezequiel talking on the phone and then him and Peters fighting. G. began to cry, so Cristina closed the apartment door.

Ezequiel also testified about the day's events. He had been asleep in the front room of the apartment when Cristina came in to tell him about something going on outside. She said, "Get up, there is a man talking to our daughter outside," and the man had followed the children. While putting on shoes, he heard Cristina say, "oh," as if scared. Ezequiel then saw Peters with "his body halfway" in the doorway, leaning his upper body inside and turning his head left to right. In English, Ezequiel yelled at Peters to get out. He wanted Peters to stop scaring his family and to leave the apartment. Peters responded by gesturing with his hands and also stepped back a little from the front door. When Ezequiel confronted him right outside the apartment, he told Peters he was going to call the police if he didn't leave. In response, Peters stated that he would come back and kill Ezequiel and his family. Ezequiel got scared because the threat was directed to his family, who were all there together, and he did not know Peters.

Ezequiel then hurried to call 911. As he was waiting for an answer, Peters was yelling at him but moving away from the apartment and back up the driveway towards the street. When Ezequiel's call was picked up and he began speaking about his situation, Peters came back towards him, approaching aggressively. He again gestured with his hands, which were up in the air in fists moving back and forth. He was also yelling profanities (e.g.,

"motherfucker"). While he did not understand everything Peters was yelling, he knew Peters was being aggressive and his behavior was threatening.

Ezequiel did not want to fight Peters but wanted to protect his family. As Peters approached, Ezequiel raised his hands to protect himself because he did not know if Peters was planning to strike him. At some point, Ezequiel dropped his phone while still on the line with 911. Ezequiel also punched Peters. Peters hit him back about four times. Peters dropped Ezequiel to the ground and began kicking him. When Ezequiel managed to get up, Peters put one of his hands around Ezequiel's neck and choked him. Ezequiel grabbed Peters, dropped him to the ground, and kept him pinned there for a while. He told Peters to calm down and eventually released him. Peters got up and left. On his way out, he picked up Ezequiel's phone and took it without permission. Police arrived 10 to 15 minutes later.

Peters was charged by information with felony assault by means likely to produce great bodily injury (§ 245, subd. (a)(4), count 1); felony dissuading a witness (§ 136.1, subd. (c)(3), count 2); misdemeanor petty theft (§ 490.2, count 3); misdemeanor loitering (§ 647, subd. (h), count 4); and misdemeanor possession of drug paraphernalia (Health and Safe. Code § 11364(a), count 5). The information further alleged that both counts 1 and 2 were committed while Peters was on felony probation pursuant to section 1203, subdivision (k) and that Peters had suffered two prior felony offenses under section 1203, subdivision (e)(4), and that both charged felony offenses were subject to second strike enhancements based upon Peters' prior strike conviction under sections 667, subdivision (d) and 1170.12, subdivision (b).

Following a jury trial, the jury returned a guilty verdict of simple assault (§ 240), a misdemeanor and lesser included crime to the assault charged in count 1, as well as of the misdemeanor offense of petty theft (§

4

490.2) charged in count 3. The jury could not reach a verdict on the felony dissuading a witness offense charged in count 2, and the court found the jury hung on that count and declared a mistrial. Counts 4 and 5 had been dismissed by the court pursuant to section 1118.1 prior to jury deliberations.

Following a second jury trial on the count 2 felony dissuading a witness charge, the jury found Peters guilty. In a bifurcated proceeding, the jury also found true the allegations that Peters was previously convicted of section 136.1, subdivision (b)(1) (dissuading a witness) and section 212.5, subdivision (c) (first-degree robbery) in 2004 and 2011, respectively. The court found true the remaining alleged enhancements under section 1203, subdivision (e)(4) and 1203, subdivision (k).

Peters was sentenced in November 2021. He was denied probation and sentenced to state prison for a total term of 12 years. For the count 2 conviction of dissuading a witness, he was ordered to serve the midterm of 3 years, which was doubled to 6 years pursuant to section 1170.12, subdivision (c)(1) plus an additional 5 years under section 667, subdivision (a)(1) for having suffered a prior serious felony. For the count 1 misdemeanor simple assault conviction and the count 3 petty theft conviction, he was sentenced to 6 months each. This appeal followed.

## DISCUSSION

### A. Prosecutorial Misconduct

Peters contends the prosecutor committed misconduct in closing argument by referencing Peters' assault conviction litigated in the first trial. He says that this left the jury with the "false impression that there were two possible factual bases for the dissuasion charge, and [jurors] did not need to unanimously agree on a single theory." We find no reversible misconduct.

5

### 1. Additional Background

In Peters' first trial, the jury hung on the count for felony dissuasion.

In his second trial, during motions in limine, Peters moved to exclude a video depicting the assault, as well as any reference to the assault, under the theory that the assault – which had already been litigated and resolved in the first trial – was prejudicial and irrelevant to the second trial's lone charge of dissuading a witness. When the court expressed its understanding that the assault was one of the target offenses which the victim was seeking to report, Peters' counsel countered that the dissuasion charge did not concern the assault because the assault had not yet happened at the time of the alleged threat. The prosecution clarified that its basis for admitting evidence of the assault was not to relitigate the assault charge but rather to demonstrate Peters' mental state as it related to the threat. The prosecution further explained that the target offense of the dissuasion charge was not the assault but rather Peters' trespass into the apartment. In the prosecution's view, Peters' statement that he would kill Ezequiel and his family if police were called and his subsequent assault against Ezequiel together amounted to witness intimidation against Ezequiel intended to prevent him from reporting the trespass to police or otherwise getting the police involved. The court denied the request to exclude the assault evidence and explained it was relevant for numerous reasons.

Later, the jury was provided with instructions as set forth in CALCRIM No. 2622. To prove Peters was guilty of intimidating a witness in violation of section 136.1, the prosecution was required to prove: "1. The defendant maliciously tried to prevent or discourage [Ezequiel] from making a report that he or someone else was a victim of a crime to any peace officer or local law enforcement officer or from causing or seeking the arrest of any person in

connection with a crime; [¶] 2. [Ezequiel] was a witness or crime victim; [¶] AND [¶] 3. The defendant knew he was trying to prevent or discourage [Ezequiel] from reporting that he or someone else was a victim of a crime to any peace officer or local law enforcement officer or from causing or seeking the arrest of any person in connections with a crime and intended to do so."

In addressing the second element – whether Ezequiel was a witness or crime victim – the prosecutor argued:

> Was [Ezequiel] a witness or a crime victim? Yes . . . [Ezequiel] is actually both. He saw the crimes, the trespass being committed. He heard the threats of when the police were going to be summoned when the defendant was told the police were going to be called. He was physically assaulted. So as he is actually on the phone with 911, and I just played it for you. While he is on the phone trying to report it, he can't report everything because Mr. Peters starts assaulting him, and you hear that yelling. The phone drops to the ground, and you can hear the 911 dispatcher saying, "Hello, Hello," trying to see if anyone is there, and you know something is going on because you can hear the assault by Mr. Peters on [Ezequiel] going on in the background. So he wasn't even able to finish the call, and the suggestion that they knew who it was when they got there, they didn't really know what happened. The only thing [Ezequiel] was able to say is that he had come in. He never got to the rest of it. And you have the call saying, "He came in. He came into my apartment," that's all he is able to get out. None of the other stuff. And then as he is a crime victim. He is physically assaulted and you have seen the pictures, and I'll show you a few later . . . .

After the prosecutor described the victim's injuries from the assault, the court interrupted and held an unreported sidebar conversation. After the sidebar, the prosecution clarified his previous argument:

> So let me be clear with regard to this. So the defendant knew he was trying to prevent or discouraging [Ezequiel] from reporting he was the victim of a crime. Obviously, we saw the assault. That happened after the initial crimes, so what I'm arguing to you is that what Mr. Peters was trying to prevent [Ezequiel] from reporting was the fact that he had trespassed onto the property at large, and then also the fact

7

that he had stuck part of his body in and was trespassing into [Ezequiel's] residence.

After Peters' counsel interjected to indicate she would make objections on the record at some point, the prosecution repeated its clarification as follows:

> So let me say that again. The crime at that point in time, because when [Ezequiel] says he is going to call the police, the only crimes that had been committed were the threat to kill his family and the trespass, and obviously Mr. Peters knew of that and was trying to prevent him . . . So with regard to the assault that happens just after that[,] that tells you what Mr. Peters' mindset was that when he made that threat, he meant it and he was intimidating – [Ezequiel] is being intimidated. So that is evidence of what Mr. Peters' mindset was. Did he intend to dissuade [Ezequiel]? And in fact, you see in the video in this continuous practice, not only is [Ezequiel] assaulted, but Mr. Peters picks up his phone and walks off with it. Clear indication Mr. Peters did not want [Ezequiel] to report the crime.

Days later, Peters moved for a mistrial in which he argued that during closing argument, the prosecution "intentionally misled the jury" by telling them that for the jury to find Peters guilty of the dissuasion charge, "they could also consider a battery as one of the underlying crimes committed against [Ezequiel] by Mr. Peters. According to Peters, this was a complete misstatement of law as the prosecution had already elected to state the underlying crime Peters committed was his alleged threat that he would come back and kill him and his family if Ezequiel called the police. Peters' counsel additionally argued that the prosecution in closing "was driving home the point" that Peters' assault against Ezequiel was being used as the underlying crime for the dissuasion charge.

In ruling on the motion, the court explained that during closing argument the mistake or confusion the court perceived was what target crime was being conveyed to the jury – the trespass or assault – given section 136.1 requires that the dissuasion serves to intimidate someone from reporting a

8

target crime. At that point, the court noted it asked for a sidebar, after which the prosecution made his clarifications to the jury. The court further added that it did not perceive any argument by the prosecution to be anything intentional at all and denied the mistrial motion.

### 2. Applicable Law

" ' "A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." ' " (*People v. Navarro* (2021) 12 Cal.5th 285, 332 (*Navarro*).) When a claim of misconduct is based on the prosecutor's arguments before the jury, we consider whether there is a reasonable likelihood the jury construed or applied the challenged remarks in an objectionable fashion. (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) We consider the statements in context and view the argument and instructions in their totality. (*Ibid.*) Reviewing courts " ' "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Brown* (2003) 31 Cal.4th 518, 553–554.) " '[T]o establish reversible prosecutorial misconduct a defendant must show that the prosecutor used " 'deceptive or reprehensible methods' " and that it is reasonably probable that, without such misconduct, an outcome more favorable to the defendant would have resulted." (*Navarro*, at p. 332.) "We review claims of prosecutorial misconduct under an abuse of discretion standard." (*People v. Dworak* (2021) 11 Cal.5th 881, 910.)

### 3. Analysis

Even assuming without deciding that the prosecutor erred by referencing the assault and effectively advancing two separate factual bases for the dissuasion charge and that the jury needed to unanimously agree on a

single theory, Peters has not shown prejudice under these circumstances. Here, the prosecutor made two references to Peters' assault against Ezequiel before the court paused proceedings with a sidebar. Following the sidebar, the prosecution clarified twice that the crime Peters was trying to prevent Ezequiel from reporting was Peters' trespass. Any possible confusion that may have arisen from the prosecutor's initial reference to the assault was immediately clarified to the jury and thereafter the trespass was properly argued as the underlying target crime by the parties. Since the assumed error was immediately corrected, we are not persuaded Peters would have received a more favorable outcome in the absence of the alleged error

## B.    *Romero* Motion

Peters next contends the court abused its discretion by refusing to dismiss his prior strike. We disagree.

### 1.    Additional Facts

Prior to sentencing, Peters filed a motion to dismiss his prior strike for sentencing purposes pursuant to *People v. Romero* (1996) 13 Cal.4th 497 (*Romero*). Peters argued that his background and the circumstances leading up to the instant case justified dismissing his prior strike. He had an unstable childhood during which he was physically abused. He had a significant, long-standing substance abuse problem from when he started to use methamphetamine 21 years earlier at age 14, which led to constant problems in his life and poor decisions. He attempted to address his addiction in program called "Choices" as well as in another monthlong program and welcomed placement in a residential drug treatment program so that he would have "an opportunity to try to beat his drug habit."

In the prosecution's view, Peters did not deserve either probation or having a strike dismissed. The prosecution's sentencing brief described

10

Peters' extensive criminal history spanning two decades which, adding the convictions in this case, included 23 misdemeanor convictions, 5 felony convictions, and 13 probation and/or parole violations as an adult. The prosecution further cited numerous aggravating factors, including the violent nature of the crimes against Ezequiel; the increasing number and seriousness of his crimes; and his numerous failed attempts on probation. At the time of the instant offense, Peters was on probation for robbery. Also cited was his apparent lack of remorse or ability to accept responsibility. The prosecution asserted that Peters had failed to put forth in any real effort to rehabilitate himself and had no factors in mitigation.

At the sentencing hearing, counsel for Peters indicated that Peters was willing to accept responsibility for his actions and to participate in substance abuse rehabilitation. Peters also addressed the court, stating that he took responsibility for his actions in escalating the situation with Ezequiel into a confrontation and taking his property.

The court denied the *Romero* motion and explained:

> [T]he first order of business for the Court . . . is to address the *Romero* motion. So I have read that and considered it, and the Court is going to deny the *Romero* motion; and I think the main reason is in reliance on the *Strong* case, . . . 87 Cal.App.4th at 328, where the Court talks about what sentencing courts are to look at when considering a *Romero* issue. It talks about the three-strikes law, it being devised for the, quote, "revolving door career criminal," and the fact that a defendant who qualifies for sentencing under the three-strikes law is also a habitual offender can hardly act as mitigation so as to take him outside the spirit of that law. Extraordinary must the circumstances be by which a career criminal can be deemed to fall outside the spirit of the very statutory scheme within which he squarely falls, and his – excuse me – his continued criminal career the law was meant to attack. And when you look at Mr. Peters' lengthy record here as set forth in the probation report, it begins about 15 days after his 18th birthday and continues unabated to the present date, and, unfortunately, it is nonstop. There's really no significant period at all when he is not

11

apparently either in custody or committing offenses. So I just don't find that granting the *Romero* motion would be in the interest of justice.

### 2.    Applicable Law

The three strikes law is intended "to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of one or more serious or violent felony offenses." (§ 667, subd. (b).) The law establishes a sentencing norm that "circumscribes the trial court's power to depart from this norm" and requires the trial court to justify explicitly its decision to depart from the norm, thereby creating a "strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*People v. Carmony* (2004) 33 Cal.4th 367, 378 (*Carmony*).)

In *Romero, supra*, 13 Cal.4th 497, the Supreme Court held that section 1385, subdivision (a), permits a trial court to strike prior felony conviction allegations in cases brought under the three strikes law when dismissal is "in furtherance of justice." (*Id.* at pp. 529–530; § 1385, subd. (a).) This discretion, while broad, is not unlimited. (*People v. Williams* (1998) 17 Cal.4th 148, 158–159 (*Williams*).) The standards for striking prior convictions under the three strikes law have been described as "stringent" and the circumstances must be " 'extraordinary' " for a career criminal to fall outside the spirit of the law. (*Carmony, supra*, 33 Cal.4th at pp. 377–378; *People v. Vasquez* (2021) 72 Cal.App.5th 374, 387.) In deciding whether to dismiss a prior strike, the court must consider both the constitutional rights of the defendant, including guarantees against disproportionate punishment, and the interests of society, including the interest in fair prosecution of properly charged crimes. (*Williams*, at pp. 159, 160–161.) More specifically, the court considers "whether, in light of the nature and circumstances of [a

12

defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of his [or her] background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he [or she] had not previously been convicted of one or more serious and/or violent felonies." (*Id.* at p. 161.)

We apply the deferential abuse of discretion standard when reviewing the trial court's refusal to dismiss a prior strike. (*Carmony, supra,* 33 Cal.4th at p. 374.) "To show an abuse of discretion, the defendant must show that the trial court's decision was 'so irrational or arbitrary that no reasonable person could agree with it.' " (*People v. Mendoza* (2022) 74 Cal.App.5th 843, 856.)

### 3. Analysis

Here, the trial court did not abuse its discretion in declining to strike Peters' prior strike. The evidence at sentencing included the *Romero* motion, probation's presentence report, the People's sentencing memorandum, and the arguments presented by the parties at the sentencing hearing, which included direct statements from Peters. After the matter was submitted, the court expressly stated that it read and considered Peters' *Romero* motion before denying it. The court's statement that it was mainly relying on *People v. Strong* (2001) 87 Cal.App.4th 328 (*Strong*), or attributing from that case the principle that there must be extraordinary circumstances for the "revolving door career criminal" to fall outside the three strikes law, did not reflect any error. Peters' extensive criminal record, which the court observed had gone on unabated for 25 years, provided reasonable grounds for the court to exercise its discretion to deny the request to dismiss his strike (see *Williams, supra,* 17 Cal.4th at pp. 163–165 [failure to refrain from criminal activity in the time between the prior and current felonies supported decision

13

not to strike priors]) and was in conformity with the spirit of the three strikes law. This was not an "extraordinary" case in which no reasonable person could conclude Peters fell within the spirit of that law. (*Carmony*, *supra*, 33 Cal.4th at p. 378.) Accordingly, Peters has not demonstrated the court's decision was an abuse of discretion.

Peters argues the trial court abused its discretion "when it failed to consider the mitigating evidence of [his] personal struggles with addiction and mental health issues, as well as his significant history of childhood trauma and instability." We disagree with Peters claim that the court relied solely on his lengthy criminal history to deny relief. " 'The trial court is not required to state reasons for declining to exercise its discretion under section 1385' [citations] and 'is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary' [citation]." (*People v. Brugman* (2021) 62 Cal.App.5th 608, 637.) Simply because the court highlighted Peters' continuing criminal activity as "the main reason" behind its decision does not mean it failed to consider every necessary factor. *Strong*, *supra*, 87 Cal.App.4th 328, the case the court cited explicitly, also instructs "that for a trial court to depart from the sentencing scheme of the 'Three Strikes' law, 'the defendant [must] be deemed [to be] outside the scheme's spirit, in whole or in part,' in light of 'the particulars of his background, character, and prospects' and the nature and circumstances of his present felonies and strikes." (*Id.* at p. 331.) Peters' *Romero* motion, which the court stated it expressly considered, also addressed these various factors. The court's focus on Peters' criminal record in its limited comments does not mean it did not consider these other factors, and we presume it did. (*People v. Gillispie* (1997) 60 Cal.App.4th 429, 434 ["On a silent record in a

14

post-*Romero* case, the presumption that a trial court ordinarily is presumed to have correctly applied the law should be applicable"].)

Peters states that "a reasonable jurist could well have exercised discretion in granting *Romero* relief in this case" given the underlying case involved "misdemeanor assaultive behavior" and the significant mitigating factors. This assertion misconstrues our standard of review. "It is not enough to show that reasonable people might disagree about whether to strike one or more of his prior convictions. Where the record demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance." (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.) The record here shows that the trial court was presented with the information relevant to a *Romero* motion, including information of the many mitigating factors in Peters' background such as the childhood trauma he suffered and his need for treatment, and exercised its discretion in conformity with the spirit of the law. It is not our role to reweigh the various factors to reach a different result.

Peters also argues that the court's denial of *Romero* relief was "contrary to the current sentencing law in California which limits judicial discretion in applying upper terms in favor of treatment and mental health care options." Peters does not identify or explain which current sentencing laws he refers to, or how they are to be reconciled with the sentencing norms established by the three strikes law. In any event, Peters was not sentenced to an upper term and provides no authority suggesting that any of these unidentified laws make his circumstances extraordinary or compel the granting of a

15

*Romero* motion under the circumstances in this case. There was no abuse of discretion.

### C.     Remand for Resentencing under section 1170(b)(6)

Peters contends that his case must be remanded for resentencing in light of amendments to section 1170, subdivision (b), which make a low-term sentence presumptively appropriate under certain circumstances. The Attorney General concedes that the recently enacted section 1170, subdivision (b)(6) ("section 1170(b)(6)") applies retroactively to Peters and remand is warranted. We, too, agree remand for resentencing is required.

On January 1, 2022, Assembly Bill 124 became effective and added section 1170, subdivision (b)(6) ("section 1170(b)(6)"), which provides in relevant part: "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence." (§ 1170(b)(6).)

As noted, Peters was sentenced in November 2021, approximately one month before section 1170(b)(6) took effect. For the count 2 conviction for dissuading a witness, the court imposed the midterm of 3 years. Peters informed the court of childhood trauma and abuse he suffered, but the record in this case does not clearly indicate the trial court would have reached the same sentencing decision if it had sentenced Peters in accordance with section 1170(b)(6). Accordingly, remand is warranted for the court to exercise its discretion and consider evidence of Peters' psychological, physical, or

16

childhood trauma in sentencing him under the newly enacted section 1170(b)(6).

## DISPOSITION

The matter is remanded for resentencing in accordance with section 1170(b)(6). In all other respects, the judgment is affirmed.

_____
Petrou, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Rodríguez, J.

A164084N/*People v. Peters*

18